]

# EXHIBIT C
**CONTINUED (2)**

2. The parties hereto shall use their reasonable efforts to take all such action as may be necessary or appropriate under state securities and Blue Sky laws in connection with the transactions contemplated by this Agreement.

3. Monsanto and Chemicals shall prepare, and Chemicals shall file and seek to make effective, an application for the listing of the Chemicals Common Stock on the NYSE, subject to official notice of issuance.

4. The parties hereto shall cooperate in preparing and filing with the SEC the Proxy Statement and the Registration Statement, and causing to become effective the Registration Statement and any other registration statements or any amendments to any thereof which are necessary or appropriate in order to effect the transactions contemplated hereby or to reflect the establishment of, or amendments to, any Plans contemplated in the Employee Benefits Allocation Agreement.

5. The parties hereto shall prepare and mail to the holders of Monsanto Common Stock such other information or documentation as the parties shall reasonably determine and as may be required by law. Monsanto and Chemicals shall prepare, and Monsanto or Chemicals shall, as applicable, file such documents, and any forms, schedules, or registration statements and any no action letter requests which are required by applicable law or which Monsanto determines are necessary or desirable to effectuate the Distribution, and Monsanto and Chemicals shall each use its reasonable efforts to obtain all necessary approvals from the SEC with respect thereto as soon as practicable.

2.06 **Special Meeting.** The Board of Directors of Monsanto, or such committee of the Board as shall be designated and so authorized by the Board of Directors of Monsanto, shall establish the Special Meeting Record Date and the Special Meeting Date, and shall take whatever other action such Board of Directors or such designated committee of the Board deems necessary or convenient with respect to the Special Meeting.

2.07 **Amendment of Monsanto Certificate of Incorporation.** At the Special Meeting, there will be submitted to the Monsanto stockholders for their vote the Monsanto Certificate Amendments as well as the Distribution.

## ARTICLE III

## THE DISTRIBUTION

3.01 **Record Date and Distribution Date.** Subject to the satisfaction or waiver of the conditions set forth in Section 10.01(a), the Board of Directors of Monsanto, or such committee of the Board as shall be authorized and designated by the Board of Directors, shall establish the Record Date and the Distribution Date and any appropriate procedures in connection with the Distribution.

3.02 **The Agent.** Prior to the Distribution Date, Monsanto shall enter into an agreement with the Agent providing for, among other things, the payment of the Distribution to the holders of Monsanto Common Stock in accordance with this Article III.

3.03 **Delivery of Share Certificates to the Agent.** Prior to or as of the Distribution Date, Monsanto shall deliver to the Agent a share certificate representing all of the outstanding shares of Chemicals Common Stock to be distributed in connection with the payment of the Distribution. After the Distribution Date, upon the request of the Agent, Chemicals shall provide all certificates for shares of Chemicals Common Stock or other evidence of ownership that the Agent shall require in order to effect the Distribution.

3.04 **Distribution.** Except as otherwise contemplated by this Agreement, Monsanto shall instruct the Agent to distribute, as of the Distribution Date, one share of Chemicals Common Stock in respect of every five (5) shares of Monsanto Common Stock held by holders of record of Monsanto Common Stock on the Record Date. All shares of Chemicals Common Stock issued in the Distribution shall be duly authorized, validly issued, fully paid and nonassessable and the holders thereof will not be entitled to preemptive rights. As soon as practicable after the Distribution Date certificates for shares of Chemicals Common Stock will be mailed by the Agent to such holders of record as of the Record Date unless Chemicals uses a book entry system of stock record keeping in which event no certificates for shares of Chemicals Common Stock will be issued unless the stockholder so requests.

3.05 **Fractional Shares.** No certificates or scrip representing fractional interests in a share of Chemicals Common Stock will be issued. Instead, if Chemicals does not adopt a book entry system, or if Chemicals does adopt a book entry system but a stockholder requests a physical stock certificate, the Agent, will, as soon as practicable after the Distribution Date, (a) determine the number of whole shares and fractional shares of Chemicals Common Stock allocable to each holder of record of Monsanto Common Stock as of the Record Date, (b) aggregate all such fractional shares, and (c) sell the whole shares attributable to the aggregate of the fractional shares at the direction of the Agent, in open market transactions or otherwise, in each case at then prevailing trading prices, and to cause to be distributed to each such holder, in lieu of any fractional share, such holder's ratable share of the proceeds of such sale, after making appropriate deductions of the amount required, if any, to be withheld for United States federal income tax purposes.

**ARTICLE IV**
**SURVIVAL, ASSUMPTION AND INDEMNIFICATION**

4.01 **Survival of Agreements.** All covenants and agreements of the parties hereto contained in this Agreement and all covenants and agreements of the parties hereto and their respective wholly-owned Subsidiaries contained in the Other Agreements shall survive the Distribution Date in accordance with their respective terms and shall not be merged into any deeds or other transfer or closing instruments or documents.

4.02 **Taxes.** This Article IV shall not be applicable to any Indemnifiable Losses or Liabilities related to (1) Taxes which shall be governed by the Tax Sharing Agreement; or (2) which are otherwise expressly provided for in those Other Agreements (excluding the Business Transfer Agreements).

4.03 **Assumption and Indemnification.**

(a) (i) Subject to Sections 4.02 and 4.03(c) and except as expressly provided in the Other Agreements, from and after the Distribution Date, Monsanto shall retain or assume, as the case may be, and shall indemnify, defend and hold harmless each member of the Chemicals Group, and each of their Representatives and Affiliates, from and against, (1) all Monsanto Liabilities and (2) all Losses of any such member of the Chemicals Group, Representative or Affiliate relating to, arising out of or due to the failure to pay, perform or discharge in due course the Monsanto Liabilities by any member of the Monsanto Group who has an obligation with respect thereto. Chemicals will use reasonable efforts not to take and to cause its wholly-owned Subsidiaries not to take any action outside the ordinary course of business after the Distribution Date which may reasonably be expected to have the effect of increasing Monsanto's or its wholly-owned Subsidiaries' Losses with respect to Monsanto Liabilities or the indemnification provided hereunder, and Chemicals will use reasonable efforts to take and to cause its wholly-owned Subsidiaries to take, at Monsanto's expense, such reasonable action as Monsanto or its wholly-owned Subsidiaries may request to mitigate all such Losses as may be incurred with respect to Monsanto Liabilities for which Monsanto has agreed to indemnify Chemicals and provided such actions do not unreasonably interfere with the conduct of Chemicals' business.

(ii) (A) The Chemicals SpinCo combined financial statements contained on pages F-1 through F-26 of the Proxy Statement (the "Chemicals Proxy Financial Statements") are fairly stated in all material respects as of the dates indicated therein and for the periods then ended and were prepared in accordance with GAAP consistently applied except as noted therein.

(B) The Statement of Consolidated Income for Monsanto for the three months and six months ended June 30, 1997, and the Statement of Consolidated Financial Position as of June 30, 1997, included in the Company's Quarterly Report on Form 10-Q, insofar as they relate to Chemicals' assets, liabilities and results of operations, prepared on a basis consistent with the first paragraph of the Basis of Presentation — Combined Financial Statements footnote on page F-6 of the Proxy Statement (the "Chemicals June 1997 Combined Financial Statements"), are fairly stated in all material respects, except for the effect of certain interim adjustments related to Chemicals required by Accounting Principles Board Opinion No. 28 and agreed to by the Chemicals' independent auditor, as of the dates indicated therein and for the periods then ended and were prepared in accordance with GAAP consistently applied except as noted therein.

(C) Management of Chemicals is not aware, except as noted in paragraph 4.03(a)(ii) (B) above, as of the date hereof, of any fact or circumstance that, had it existed prior to the preparation of the Chemicals Proxy Financial Statements and the Chemicals

June 1997 Combined Financial Statements, would have had a material adverse effect on the results of operations or the financial position set forth in such financial statements.

(iii) Due to the difficulty in ascertaining the precise amount of actual damages which Monsanto would sustain as a result of Chemicals' representations set forth in paragraph 4.03(a)(ii) above being untrue, the parties hereby agree and stipulate that liquidated damages are appropriate. The amount of liquidated damages shall be equal to $20,000,000, and the parties agree that such sum is reasonable in light of the circumstances and the nature of the damages that would accrue to Monsanto.

(b) Subject to Section 4.02 and 4.03(c) and except as expressly provided in the Other Agreements, from and after the Distribution Date, Chemicals shall retain or assume, as the case may be, and shall indemnify, defend and hold harmless each member of the Monsanto Group, and each of their Representatives and Affiliates, from and against, (1) all Chemicals Liabilities, including without limitation, the indebtedness under the Financing Facility, and (2) any and all Losses of any such member of the Monsanto Group, Representative or Affiliate relating to, arising out of or due to the failure to pay, perform or discharge in due course the Chemicals Liabilities by any member of the Chemicals Group who has an obligation with respect thereto. Monsanto will use reasonable efforts not to take and to cause its wholly-owned Subsidiaries not to take any action outside the ordinary course of business after the Distribution Date which may reasonably be expected to have the effect of increasing Chemicals' or its wholly-owned Subsidiaries' Losses with respect to Chemicals Liabilities or the indemnification provided hereunder and Monsanto will use reasonable efforts to take and will cause its wholly-owned Subsidiaries to take at Chemicals' expense such reasonable action as Chemicals or its wholly-owned Subsidiaries may reasonably request to mitigate all such Losses as may be incurred with respect to Chemicals Liabilities for which Chemicals has agreed to indemnify Monsanto and provided such actions do not unreasonably interfere with the conduct of Monsanto's business.

(c) The amount which an Indemnifying Party is required to pay to any Indemnitee pursuant to Section 4.03(a) or (b) shall be reduced (including, without limitation, retroactively) by any Insurance Proceeds and other amounts (including, without limitation, amounts received from Third Parties in respect of other indemnification or contribution obligations of Third Parties) actually recovered by such Indemnitee in reduction of the related Indemnifiable Loss, it being understood and agreed that each member of the Monsanto Group and the Chemicals Group shall use its reasonable best efforts, at the expense of the Indemnifying Party, to collect any such proceeds or other such amounts to which it or any of its wholly-owned Subsidiaries is entitled, without regard to whether it is the Indemnified Party hereunder. If an Indemnitee receives an Indemnity Payment in respect of an Indemnifiable Loss and subsequently receives Insurance Proceeds or other amounts in respect of such Indemnifiable Loss, then such Indemnitee shall pay to such Indemnifying Party an amount equal to the difference between (1) the sum of the amount of such Indemnity Payment and the amount of such Insurance Proceeds or other amounts actually received and (2) the amount of such Indemnifiable Loss. An insurer or a Third Party (including, without limitation, purchasers under any assets purchase agreements, real estate agreements or any other agreements relating to Chemicals Liabilities or Monsanto Liabilities, including without limitation, those agreements set forth on Schedule 4.03(c), who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto, or, solely by virtue of

the indemnification provisions hereof, have any subrogation rights with respect thereto, it being expressly understood and agreed that no insurer or any other Third Party shall be entitled to a "windfall" (i.e., a benefit they would not be entitled to receive in the absence of the indemnification provisions set forth herein) by virtue of the indemnification provisions hereof.

(d) If any Indemnity Payment required to be made hereunder or under any Other Agreement is denominated in a currency other than United States dollars, the amount of such payment, at the election of the Indemnifying Party, may be reimbursed in local currency or shall be translated into United States dollars using the Foreign Exchange Rate for such currency determined in accordance with the following rules:

(1) with respect to an Indemnifiable Loss arising from payment by a financial institution under a guarantee, comfort letter, letter of credit, foreign exchange contract or similar instrument, the Foreign Exchange Rate for such currency shall be determined as of the date on which such financial institution is reimbursed;

(2) with respect to an Indemnifiable Loss covered by insurance, the Foreign Exchange Rate for such currency shall be the Foreign Exchange Rate employed by the insurance company providing such insurance in settling such Indemnifiable Loss with the Indemnifying Party; and

(3) with respect to an Indemnifiable Loss not described in clause (1) or (2) of this Section 4.03(d), the Foreign Exchange Rate for such currency shall be determined as of the date of payment to a Third Party in the case of such payments or as of the date that notice of the claim with respect to such other Indemnifiable Loss is given to the Indemnitee.

(e) On the Distribution Date Chemicals shall assume (or shall cause one of its wholly-owned Subsidiaries to assume) (i) the prosecution of all claims which are Chemicals Assets and are pending on the Distribution Date; and (ii) the defense against all Third Party Claims which are Chemicals Liabilities and are pending on the Distribution Date. Monsanto shall use reasonable efforts to make available and shall cause its wholly-owned Subsidiaries to use reasonable efforts to make available to Chemicals and its wholly-owned Subsidiaries, at Chemicals' expense, (i) any personnel or any books, records or other documents within its control or which it otherwise has the ability to make available that Chemicals or such Subsidiary reasonably believes are necessary or appropriate for such prosecution or defense as provided in Article VI; and (ii) such other assistance in support of the prosecution or defense of such litigation as Chemicals or its wholly-owned Subsidiaries may reasonably request, including without limitation, the right to assert in the name of Monsanto or any of its wholly-owned Subsidiaries such rights, claims, counterclaims or defenses that Monsanto or Monsanto's Subsidiary would be or would have been entitled to assert in such litigation or in the prosecution of or defense against such claim had the Distribution not occurred; provided, however, that no member of the Monsanto Group shall be required to take any action, refrain from taking any action or make available any assistance if doing so would have the effect of increasing Liabilities of the Monsanto Group. Monsanto will execute and will cause its wholly-owned Subsidiaries to execute a power of attorney in the form attached hereto as Exhibit 4.03(e).

4.04 Procedure for Indemnification.

(a) If any Indemnitee receives notice of the assertion of any Third Party Claim with respect to which an Indemnifying Party is obligated under this Agreement to provide indemnification, such Indemnitee shall give such Indemnifying Party notice thereof promptly after becoming aware of such Third Party Claim; provided, however, that the failure of any Indemnitee to give notice as provided in this Section 4.04 shall not relieve any Indemnifying Party of its obligations under this Article IV, except to the extent that such Indemnifying Party is actually prejudiced by such failure to give notice. Such notice shall describe such Third Party Claim in reasonable detail and, if practicable, shall indicate the estimated amount of the Indemnifiable Loss that has been or may be sustained by such Indemnitee.

(b) An Indemnifying Party, at such Indemnifying Party's own expense and through counsel chosen by such Indemnifying Party (which counsel shall be reasonably satisfactory to the Indemnitee), may elect to defend any Third Party Claim. If an Indemnifying Party elects to defend a Third Party Claim, then, within fifteen Business Days after receiving notice of such Third Party Claim or sooner (but in no event less than five Business Days) if the nature of such Third Party Claim so requires), such Indemnifying Party shall notify the Indemnitee of its intent to do so. Such Indemnitee shall thereupon use reasonable efforts to make available to such Indemnifying Party, at such Indemnifying Party's expense, such assistance in support of the prosecution or defense of such litigation as the Indemnifying Party may reasonably request, including without limitation, the right to assert in the name of the Indemnitee such rights, claims, counterclaims or defenses that such Indemnitee would be or would have been permitted to assert in such litigation or in the prosecution of a claim or counterclaim against a Third Party or in defense against such Third Party Claim had the Distribution not occurred. The Indemnitee will execute a power of attorney in favor of the Indemnifying Party with respect to such Third Party Claims in substantially the form attached hereto as Exhibit 4.03(e). Such Indemnifying Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation consistent with the provisions of Article VI. Except as provided herein, after notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this Article IV for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense thereof. If an Indemnifying Party elects not to defend against a Third Party Claim, or fails to notify an Indemnitee of its election as provided in this Section 4.04 within the period of fifteen (or five, if applicable) Business Days described above, such Indemnitee may defend, compromise and settle such Third Party Claim; provided, however, that no such Indemnitee may compromise or settle any such Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

(c) Notwithstanding the foregoing, the Indemnifying Party shall not, without the prior written consent of the Indemnitee, settle or compromise any Third Party Claim or consent to the entry of any judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release from all Liability in respect of such Third Party Claim.

(d) If an Indemnifying Party chooses to defend or to seek to compromise any Third Party Claim, the related Indemnitee shall make available to such Indemnifying Party any personnel or any books, records or other documents within its control or which it otherwise has the ability to make available that are necessary or appropriate for such defense.

(e) Any claim on account of an Indemnifiable Loss arising out of or due to the failure to pay, perform or discharge in due course its respective Liabilities by any member of the Indemnifying Party's Group who has an obligation with respect thereto but which does not result from a Third Party Claim shall be asserted by written notice given by the Indemnitee to the related Indemnifying Party. Such Indemnifying Party shall have a period of 30 days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such 30-day period, such Indemnifying Party shall be deemed to have refused to accept responsibility to make payment. If such Indemnifying Party does not respond within such 30-day period or rejects such claim in whole or in part, such Indemnitee shall be free to pursue such remedies as may be available to such party under Article VII of this Agreement.

(f) If the amount of any Indemnifiable Loss shall, at any time subsequent to the payment required by this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnitee to the Indemnifying Party.

(g) In the event of payment by an Indemnifying Party to any Indemnitee in connection with any Third Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnitee as to any events or circumstances in respect of which such Indemnitee may have any right or claim relating to such Third Party Claim against any claimant or plaintiff asserting such Third Party Claim. Such Indemnitee shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right or claim, including without limitation, permitting the Indemnifying Party to bring suit against such Third Party in the name of the Indemnitee.

## ARTICLE V

## CERTAIN ADDITIONAL COVENANTS

**5.01 Further Assurances.**

(a) In addition to the actions specifically provided for elsewhere in this Agreement and unless otherwise expressly provided in this Agreement or an Other Agreement, each of the parties hereto shall use its reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement, to confirm Chemicals' title to all Chemicals Assets and assumption of all Chemical Liabilities, to put Chemicals in actual possession and operating control of Chemicals Assets and Chemicals Liabilities, and to permit Chemicals to exercise all rights and to perform its obligations with respect to Chemicals Assets and Chemicals Liabilities; provided, that nothing herein shall be

deemed to require the transfer of any Assets or the assumption of any Liabilities which by their terms or operation of law cannot be transferred or assumed. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use its reasonable efforts to cause to be executed and delivered, all instruments, including instruments of conveyance, assignment and transfer, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement, indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by any other party hereto from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions and purposes of this Agreement and the transfers of Assets and Liabilities and the other transactions contemplated hereby. If any such transfer of Assets or Liabilities, including but not limited to, assignments of contracts, is not consummated prior to or at the Distribution Date for any reason, including but not limited to, the absence of consents to assignment of contracts or approval by Governmental Authorities for the transfer of permits, then the party hereto retaining such Asset or Liability shall thereafter hold such Asset in trust for the use and benefit of the party entitled thereto (at the expense of the party entitled thereto), or shall retain such Liability for the account of the party by whom such Liability is to be assumed pursuant hereto, as the case may be, and shall take such other action as may be reasonably requested by the party to whom such Asset is to be transferred, or by whom such Liability is to be assumed, as the case may be, in order to place such party, insofar as reasonably possible, in the same position as if such Asset or Liability had been transferred as contemplated hereby. If and when any such Asset or Liability becomes transferable, such transfer shall be effected forthwith. The parties hereto agree that, as of the Distribution Date, as between the parties, Chemicals shall be deemed to have acquired complete and sole beneficial ownership of all of the Chemicals Assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of the Chemicals Liabilities, and all duties, obligations and responsibilities incident thereto.

(b) Without limiting the generality of Section 5.01(a), Monsanto, as the sole stockholder of Chemicals prior to the Distribution, shall ratify any actions which are reasonably necessary or desirable to be taken by Chemicals to effectuate the transactions contemplated by this Agreement or the Other Agreements in a manner consistent with the terms of this Agreement or such Other Agreements.

(c) In the event any registration, licenses, permits or other rights granted by Governmental Authorities to the Monsanto Group must be transferred, amended or issued in order to conduct operations of the Chemicals Business after the Distribution Date, and such permit transfer, amendment or issuance has not been accomplished as of such date, Monsanto shall permit Chemicals to use the registration, license or permit of the Monsanto Group to continue to operate the Chemicals Facilities until such transfer, amendment or issuance is accomplished, at Chemicals' expense, if to so do would be permitted by and not violate the terms of the registration, license or permit or any law, regulation, ordinance or rule, until such permit is transferred or issued to Chemicals. Chemicals shall use its reasonable efforts to obtain such registrations, licenses, permits or other rights granted by Governmental Authorities as soon as reasonably practicable. Chemicals shall indemnify and hold harmless Monsanto from and against any and all Third Party Claims arising from or related to Chemicals' use of the registration, license or permit or other rights granted to the Monsanto Group by Governmental Authorities.

(d) Schedule 1.01(11) to this Agreement includes among other items, certain parcels of real estate which are Chemicals Assets but which, in some cases, are subject to contracts for sale to Third Parties ("Sale Real Estate") or which, in other cases, cannot be transferred without one party incurring a substantial economic detriment which detriment could otherwise be deferred or avoided ("Non-Sale Real Estate"). Monsanto and Chemicals agree that Monsanto shall retain title to such Sale Real Estate and Non-Sale Real Estate following the Distribution Date and shall not transfer to Chemicals the title or assign to Chemicals the contract(s) for sale or any other permits, licenses or contracts with respect to such real estate subject to the following terms and conditions:

(i) Monsanto from and after the Distribution Date will hold the Sale Real Estate and the Non-Sale Real Estate in trust for the benefit of Chemicals;

(ii) Monsanto hereby irrevocably designates Chemicals as its attorney-in-fact and agent for all purposes with respect to all such Sale Real Estate and Non-Sale Real Estate, including without limitation, for all remediation, monitoring and other activities, with respect to such Sale Real Estate and Non-Sale Real Estate; for all filings, notices and any other negotiations, activities or discussions with any Governmental Authority and/or any branch, commission, board or other subdivision thereof; for all discussions, negotiations or agreements with Third Parties with respect to, or arising from, such Sale Real Estate and Non-Sale Real Estate; and for all purposes relating to the execution, delivery and closing of contracts, agreements, documents or instruments with respect the ownership, use, occupation, sale or lease of the Sale Real Estate or Non-Sale Real Estate. In furtherance of such designation, Monsanto will execute powers of attorney in the form attached hereto as Exhibit 5.01(d)(ii) for each site;

(iii) Monsanto will take no action without the prior written consent of Chemicals which may have the effect of increasing Chemicals' liability with respect to any Sale Real Estate or Non-Sale Real Estate; and will take such action as is permitted by contract, in the absence of consent of the other party, and by law to place Chemicals, insofar as reasonably possible, in the same position as if such Sale Real Estate and Non-Sale Real Estate had been transferred, or conveyed to Chemicals on the Distribution Date;

(iv) In the event any Sale Real Estate is not sold or conveyed to a Third Party pursuant to a contract in existence on the Distribution Date or, at any other time, upon the request of Chemicals with respect to any parcel of Sale Real Estate or Non-Sale Real Estate, Monsanto shall transfer and convey title to the affected parcel of real estate to Chemicals; and

(v) As between Monsanto and Chemicals, such Sale Real Estate and Non-Sale Real Estate shall be treated as Chemicals Assets, and Liabilities related to or arising from Sale Real Estate or Non-Sale Real Estate shall be Chemicals Liabilities and subject to the indemnification provisions contained in Section 4.03(b) notwithstanding the fact that such Sale Real Estate or Non-Sale Real Estate was not transferred to Chemicals.

(e) If Chemicals elects to pursue any claim or right relating to the Chemicals Assets, the Chemicals Business or the Former Chemicals Business, Monsanto, upon request and at Chemicals' expense, shall use reasonable efforts to make available to Chemicals such assistance in support of

the prosecution of such litigation as Chemicals may reasonably request, including without limitation, the right to assert, as needed, in the name of Monsanto or any member of the Monsanto Group such rights and claims that Monsanto or such member would be or would have been permitted to assert in such litigation had the Distribution not occurred; provided, however, that no member of the Monsanto Group shall be required to take any action, refrain from taking any action or make available any assistance if doing so would have the effect of increasing Liabilities of the Monsanto Group. Monsanto or such member of the Monsanto Group will execute a power of attorney in favor of Chemicals or such member of the Chemicals Group in the form attached hereto as Exhibit 4.03(e).

5.02 **Chemicals Board.** Prior to, or simultaneously with, the Distribution Date, Chemicals shall take such actions as are necessary such that the Board of Directors of Chemicals is comprised of those individuals named as directors of Chemicals in the Proxy Statement.

5.03 **Financing.** Effective as of the Distribution Date:

(a) The obligations under the assumable commercial paper portion of the Financing Facility shall be assigned to, and assumed by, Chemicals, and guaranteed by Monsanto, with the effect that Chemicals shall have the primary obligation thereunder and Monsanto shall become the guarantor with respect thereto;

(b) On the Distribution Date, Chemicals shall assume from Monsanto, and indemnify Monsanto from, all Liabilities under the assumable commercial paper portion of the Financing Facility and the Third Party indebtedness specified on Schedule 5.03(b); and

(c) (i) Except as provided in Schedule 5.03(c)(i), (w) all intercompany accounts receivables and payables between members of the Groups in Europe and in South Africa, and all Third Party receivables and payables owed to or by members of the Groups in Europe and in South Africa that arose prior to June 1, 1997, will be treated in accordance with the related Business Transfer Agreement, including without limitation, those agreements on Intercompany Receivables and Payables and Bad Debts dated as of September 1, 1997 between (1) Monsanto Chemicals Europe SA/NV and Monsanto Europe SA/NV and (2) Monsanto p.l.c. and Monsanto Chemicals U.K. Limited and certain other entities referred to collectively therein as DSO's; (x) all intercompany accounts receivables and payables between members of the Monsanto Group in Europe and in South Africa, and all Third Party receivables and payables related to the Monsanto Business in Europe and in South Africa that arose on or after June 1, 1997, will remain as Monsanto Assets and Monsanto Liabilities; (y) all intercompany accounts receivables and payables between members of the Chemicals Group in Europe and in South Africa and all Third Party receivables and payables related to the Chemicals Business in Europe and South Africa that arose on or after June 1, 1997 shall remain as Chemicals Assets and Chemicals Liabilities; and (z) any intercompany receivables and payables that arose after June 1, 1997 between members of the Monsanto Group in Europe and in South Africa and members of the Chemicals Group in Europe and in South Africa shall remain with each respective entity on whose books such receivable and payable exists on the Distribution Date.

# EXHIBIT B
# PART II

(ii) All intercompany balances relating to products of the Chemicals Business or Former Chemicals Business between the Monsanto Group outside of Europe and South Africa and the Chemicals Group outside of Europe and South Africa and all Third Party payables and receivables related to the Chemicals Business, Former Chemicals Business or Chemicals Assets will be transferred to the Chemicals Group as Chemicals Assets and Chemicals Liabilities on the Distribution Date.

(iii) All intercompany loans or advances between a member of the Chemicals Group and a member of the Monsanto Group shall remain with, or be transferred to, the members of the Monsanto Group, it being the intent that as of the Distribution Date neither Group shall have a continuing obligation with respect to such loan or and advance to the other Group.

5.04 **Other Agreements.** Each of Monsanto and Chemicals shall use reasonable efforts to enter into, or to cause the appropriate members of its Group to enter into, the Other Agreements on or prior to the Distribution Date. If there shall be a conflict or an inconsistency between the provisions of this Agreement and the provisions of an Other Agreement (i) the provisions of this Agreement shall control over the inconsistent provisions of a Business Transfer Agreement as to matters within the scope of the Business Transfer Agreement; and (ii) the provisions of the Other Agreement (other than any Business Transfer Agreement) shall control over the inconsistent provisions of this Agreement as to matters within the scope of such Other Agreement.

5.05 **Chemicals Support Agreements.** Effective as of the Distribution Date, and unless otherwise agreed between Monsanto and Chemicals, Chemicals shall use its reasonable best efforts to cause one or more members of the Chemicals Group to be substituted in all respects for the Monsanto Group or any member thereof in respect of all Chemicals Support Agreements. Subsequent to the Distribution Date, with respect to any uncancelled Chemicals Support Agreement for which no substitution has yet been effected, Chemicals shall indemnify the Monsanto Group against any Liabilities under any such Chemicals Support Agreement in accordance with the provisions of Article IV.

5.06 **Officers and Employees.**

(a) Subject to the provisions of Section 5.06(b), officers and employees of either Group who are employed in the Chemicals Business immediately prior to the Distribution Date shall be officers and employees of the Chemicals Group immediately following the Distribution Date; *provided, however*, that nothing herein shall give to any individual a right of employment, or continued employment, by any member of the Chemicals Group.

(b) Except as otherwise agreed by the parties hereto, effective as of the Distribution Date, (1) all officers or employees of the Monsanto Group who are acting as directors or officers of the Chemicals Group and are not employed in the Chemicals Business shall resign from such positions with the Chemicals Group and (2) all officers or employees of the Chemicals Group who are acting as directors or officers of the Monsanto Group and are not employed in the Monsanto Business shall resign from such positions with the Monsanto Group.

5.07 **Monsanto Citizenship Fund.** Prior to the Distribution Date, Chemicals will establish a political action committee consistent with the rules of the Federal Election Commission for a separate segregated fund ("Chemicals PAC") and the Monsanto Citizenship Fund will transfer to such Chemicals PAC $16,951.00 plus any amounts held by the Monsanto Citizenship Fund for future earmarking by Chemicals Employees which has been or may be agreed to.

5.08 **Receivables Collection and Other Payments.** If after the Distribution Date, either party receives payments belonging to the other party, the recipient shall promptly account for and remit same to the other party.

5.09 **Limited Leases, Licenses and Benefits of Certain Assets.**

(a) With respect to sold or discontinued businesses for which Chemicals has assumed a Chemicals Liability, Monsanto hereby grants a lease or license, and shall cause its wholly-owned Subsidiaries to grant a lease or license, to members of the Chemicals Group, without compensation and on a non-exclusive basis, with respect to such Monsanto Assets (or the benefit of such Monsanto Assets) relating to sold or discontinued businesses, including without limitation, those rights under contracts, leases or licenses held on the Distribution Date, in each case to the extent the use or benefit of such Monsanto Assets is reasonably necessary to satisfy such Chemicals Liabilities assumed by any member of the Chemicals Group pursuant to this Agreement or any Other Agreement.

(b) With respect to a Former Chemicals Business for which Monsanto has retained a Monsanto Liability, including without limitation, Monsanto Liabilities under operating agreements with Third Parties, Chemicals hereby grants a lease or license, and shall cause its wholly-owned Subsidiaries to grant a lease or license, to members of the Monsanto Group, without compensation and on a non-exclusive basis with respect to such Chemicals Assets (or the benefit of such Chemicals Assets) relating to the Former Chemicals Business, including without limitation, those rights under contracts, leases or licenses held on the Distribution Date, in each case to the extent the use or benefit of such Chemicals Assets is reasonably necessary to satisfy such Monsanto Liabilities.

5.10 **Chemicals' Use of Chemicals Assets Subject to IRBs.** Monsanto is retaining as Monsanto Liabilities the IRBs and all obligations related to the payment of principal and interest thereunder and is retaining as Monsanto Assets all rights with respect to the IRBs except the right to the ownership or occupancy of the property transferred to Chemicals as Chemicals Assets. Chemicals, however, agrees that Chemicals shall comply with all of the covenants and agreements set forth in the IRBs and any related agreements entered into in connection with the IRBs that are applicable to the owner or operator of the property or that affect the use of the property and shall not take any action which, or fail to take any action the failure of which, could increase or accelerate Monsanto's liabilities under the IRBs or adversely affect the exclusion from gross income of interest on the IRBs. Chemicals shall not sell or otherwise transfer any properties or assets relating to the IRBs unless the transferee agrees to assume Chemicals' obligations under this Section 5.10 pursuant to an agreement reasonably satisfactory to Monsanto,

Chemicals shall indemnify, defend and hold Monsanto harmless from any Liabilities or Losses to the extent arising from its breach of its covenants in this Section 5.10.

## ARTICLE VI

### ACCESS TO INFORMATION

6.01 **Provision of Corporate Records.** Prior to or as promptly as practicable after the Distribution Date or from time to time as requested by the Chemicals Group, the Monsanto Group shall deliver to the Chemicals Group: (i) all corporate books and records of the Chemicals Group; (ii) originals or copies of those corporate books and records of the Monsanto Group primarily relating to the Chemicals Assets, the Chemicals Liabilities, the Chemicals Business or the Former Chemicals Business; (iii) originals or, at Monsanto's election, copies of all other corporate records and books of the Monsanto Group relating to the Chemicals Group, Chemicals Assets, the Chemicals Liabilities, the Chemicals Business, the Former Chemicals Business, the Joint Ownership Properties, the P4 Business, or the Other Agreements; including without limitation in each case, all active agreements, active litigation files and government filings; and (iv) copies of any and all Insurance Policies. From and after the Distribution Date, all such books, records and copies (where copies are delivered in lieu of originals) whether or not delivered shall be the property of the Chemicals Group; provided, however, that all such Information contained in such books, records or copies relating to the Monsanto Group, Monsanto Assets, the Monsanto Liabilities, the Monsanto Business, the Joint Ownership Properties, the P4 Business, or the Other Agreements shall be subject to the applicable confidentiality provisions and restricted use provisions, if any, contained in this Agreement or the Other Agreements and any confidentiality restrictions imposed by law. Monsanto, if it so elects, may retain copies of any original books and records delivered to Chemicals along with those original books and records of the Monsanto Group authorized herein to be retained (excluding books and records to the extent relating to Chemicals Technology as defined in the Intellectual Property Agreements or relating exclusively to Chemicals' use of Shared Know How as defined in the Intellectual Property Agreements in the Chemicals Business or Former Chemicals Business); provided, however, that all such Information contained in such books, records or copies (whether or not delivered to the Chemicals Group) relating to the Chemicals Group, the Chemicals Assets, the Chemicals Liabilities, the Chemicals Business, the Former Chemicals Business, the Joint Ownership Properties, the P4 Business, or the Other Agreements shall be subject to the applicable confidentiality provisions and restricted use provisions, if any, contained in this Agreement or the Other Agreements and any confidentiality restrictions imposed by law.

6.02 **Access to Information.** In addition to the provisions set forth in Section 6.01 above, from and after the Distribution Date and upon reasonable notice, each of the Monsanto Group and the Chemicals Group shall afford to the other and to the other's Representatives at the expense of the other party, reasonable access and duplicating rights during normal business hours to all Information developed or obtained prior to the Distribution Date within such party's possession relating to the other party or its businesses, its former businesses, its Assets, its Liabilities, the Joint Ownership Properties, the P4 Business, or the Other Agreements, insofar as such access is reasonably requested by such other party, but subject to the applicable confidentiality provisions

and restricted use provisions, if any, contained in this Agreement or the Other Agreements and any confidentiality restrictions imposed by law. In addition, without limiting the foregoing, Information may be requested under this Section 6.02 for audit, accounting, claims, intellectual property protection, litigation and Tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations. In each case, the requesting party agrees to cooperate with the other party to minimize the risk of unreasonable interference with the other party's business. In the event access to any Information otherwise required to be granted herein or in the Other Agreements is restricted by law or otherwise, the parties agree to take such actions as are reasonably necessary, proper or advisable to have such restrictions removed or to seek an exemption therefrom or to otherwise provide the requesting party with the benefit of the Information to the same extent such actions would have been taken on behalf of the requesting party had such a restriction existed and the Distribution not occurred.

6.03 **Litigation Support and Production of Witnesses.** After the Distribution Date, each member of the Monsanto Group and the Chemicals Group shall use reasonable efforts to provide assistance to the other with respect to litigation and to make available to the other, upon written request: (i) such employees who have expertise or knowledge with respect to the other party's business or products or matters in litigation, for the purpose of consultation and/or as a witness; and (ii) its directors, officers, other employees and agents, as witnesses, in each case to the extent that the requesting party believes any such Person may reasonably be useful or required in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved. The employing party agrees that such consultant or witness shall be made available to the requesting party upon reasonable notice to the same extent that such employing party would have made such consultant or witness available if the Distribution had not occurred. The requesting party agrees to cooperate with the employing party in giving consideration to business demands of such Persons.

6.04 **Reimbursement.** Except to the extent otherwise contemplated by this Agreement or any Other Agreement, a party providing Information, consultant, or witness services to the other party under this Article VI shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payments for such amounts, relating to supplies, disbursements, travel expenses, and other out-of-pocket expenses (including the direct and indirect costs of employees providing consulting and expert witness services in connection with litigation, but excluding direct and indirect costs of employees who provide Information or are fact witnesses) as may be reasonably incurred in providing such Information, consulting or witness services.

6.05 **Retention of Records.** Except as otherwise required by law or agreed in writing, or as otherwise provided in the Tax Sharing Agreement, each member of the Monsanto Group and the Chemicals Group shall retain, for the periods set forth in the Monsanto Company Records Retention Manual dated April, 1994 or such longer period as may be required by law, this Agreement or the Other Agreements, all significant Information in such party's possession or under its control relating to the business, former business, Assets or Liabilities of the other party or the Joint Ownership Properties or the P4 Business or this Agreement or the Other Agreements and, after the expiration of such applicable period, prior to destroying or disposing of any of such Information, (a) the party proposing to dispose of or destroy any such Information shall provide no less than 30 days' prior written notice to the other party, specifying the Information proposed to be

destroyed or disposed of, and (b) if, prior to the scheduled date for such destruction or disposal, the other party requests in writing that any of the Information proposed to be destroyed or disposed of be delivered to such other party, the party proposing to dispose of or destroy such Information promptly shall arrange for the delivery of the requested Information to a location specified by, and at the expense of, the requesting party.

      6.06 **Privileged Information.** In furtherance of the rights and obligations of the parties set forth in this Article VI:

      (a) Each party hereto acknowledges that (1) each of the Monsanto Group on the one hand, and the Chemicals Group on the other hand, has or may obtain Information regarding a member of the other Group, or any of its operations, employees, Assets or Liabilities (whether in documents or stored in any other form or known to its employees or agents), as applicable, that is or may be protected from disclosure pursuant to the attorney-client privilege, the work product doctrine or other applicable privileges ("Privileged Information"); (2) there are a number of actual, threatened or future litigations, investigations, proceedings (including arbitration proceedings), claims or other legal matters that have been or may be asserted by or against, or otherwise affect, each or both of Monsanto and Chemicals (or members of either Group) ("Litigation Matters"); (3) Monsanto and Chemicals have a common legal interest in Litigation Matters, in the Privileged Information, and in the preservation of the confidential status of the Privileged Information, in each case relating to the Monsanto Business or the Chemicals Business or any former businesses, the Assets or the Liabilities of each party or the Joint Ownership Properties or the P4 Business as it or they existed prior to the Distribution Date or relating to or arising in connection with the relationship between the constituent elements of the Groups on or prior to the Distribution Date; and (4) Monsanto and Chemicals intend that the transactions contemplated by this Agreement and the Other Agreements and any transfer of Privileged Information in connection herewith or therewith shall not operate as a waiver of any potentially applicable privilege.

      (b) Each of Monsanto and Chemicals agrees, on behalf of itself and each member of the Group of which it is a member, not to disclose or otherwise waive any privilege attaching to any Privileged Information relating to the Monsanto Business or the Chemicals Business or any former businesses or Assets or Liabilities of either party or the Joint Ownership Properties or the P4 Business as they or it existed prior to the Distribution Date, respectively, or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date, without providing prompt written notice to and obtaining the prior written consent of the other, which consent shall not be unreasonably withheld and shall not be withheld if the other party certifies that such disclosure is to be made in response to a likely threat of suspension or debarment or similar action; provided, however, that Monsanto and Chemicals may make such disclosure or waiver with respect to Privileged Information if such Privileged Information relates, in the case of Monsanto, solely to the Monsanto Business, its former businesses (other than the Chemicals Business or Former Chemicals Business or the P4 Business), the Monsanto Assets or the Monsanto Liabilities as each existed prior to the Distribution Date or, in the case of Chemicals, solely to the Chemicals Business, the Former Chemicals Business, the Chemicals Assets or the

Chemicals Liabilities, as each existed prior to the Distribution Date. In the event of a disagreement between any member of the Monsanto Group and any member of the Chemicals Group concerning the reasonableness of withholding such consent, no disclosure shall be made prior to (i) a final, nonappealable resolution of such disagreement by a court of competent jurisdiction if such requirement to disclose is part of a pending judicial proceeding; or (ii) a final determination by an arbitrator appointed pursuant to Article VII if such requirement to disclose is not part of a pending judicial proceeding.

(c) Upon any member of the Monsanto Group or any member of the Chemicals Group receiving any subpoena or other compulsory disclosure notice from a court, other governmental agency or otherwise which requests disclosure of Privileged Information, in each case relating to the Monsanto Business, its former businesses (other than the Chemicals Business or Former Chemicals Business or the P4 Business), the Monsanto Assets or the Monsanto Liabilities (in the case of the Chemical Group) or the Chemicals Business, Former Chemicals Business, the Chemicals Assets or the Chemicals Liabilities (in the case of the Monsanto Group) or the Joint Ownership Properties or the P4 Business (in the case of either Group), as they or it existed prior to the Distribution Date or relating to or arising in connection with the relationship between the constituent elements of the Groups on or prior to the Distribution Date, the recipient of the notice shall promptly provide to Monsanto, in the case of receipt by a member of the Chemicals Group, or to Chemicals, in the case of receipt by a member of the Monsanto Group, a copy of such notice, the intended response, and all materials or information relating to the other Group that might be disclosed. In the event of a disagreement as to the intended response or disclosure, unless and until the disagreement is resolved as provided in paragraph (b) above, Monsanto and Chemicals shall cooperate to assert all defenses to disclosure claimed by either Group, at the cost and expense of the Group claiming such defense to disclosure, and shall not disclose any disputed documents or information until all legal defenses and claims of privilege have been finally determined.

6.07 **Confidentiality.** From and after the Distribution Date, each of Monsanto and Chemicals shall hold, and shall use its reasonable best efforts to cause its employees, Affiliates and Representatives to hold, in strict confidence all Information concerning or belonging to the other party obtained by it prior to the Distribution Date or furnished to it by such other party pursuant to this Agreement or the Other Agreements and shall not release or disclose such Information to any other Person, except its Representatives, who shall be bound by the provisions of this Section 6.07; provided, however, that Monsanto and Chemicals and their respective employees, Affiliates and Representatives may disclose such Information to the extent that (a) disclosure is compelled by judicial or administrative process or, in the opinion of such party's counsel, by other requirements of law, or (b) such party can show that such Information was (1) available to such party after the Distribution Date from Third Party sources other than employees or former employees of either party, their Affiliates, former Affiliates, Representatives or former Representatives, on a nonconfidential basis prior to its disclosure to such party after the Distribution Date by the other party, (2) in the public domain through no fault of such party, (3) lawfully acquired by such party from Third Party sources other than employees or former employees of either party, their Affiliates, former Affiliates, Representatives or former Representatives, after the time that it was furnished to such party pursuant to this Agreement or the Other Agreements or (4) is independently discovered

-33-

or developed after the Distribution Date by employees of such party. Notwithstanding the foregoing, each of Monsanto and Chemicals and their respective Representatives and Affiliates shall be deemed to have satisfied its obligations under this Section 6.07 with respect to any Information if it exercises the same care with regard to such Information as it takes to preserve confidentiality for its own similar Information. Each party further covenants that it shall not disclose to any Third Party (or any successor by merger or otherwise) the fact that the other party uses Shared Know How (as defined in the Intellectual Property Agreements) or if known, the particulars of such use.

## ARTICLE VII

## ARBITRATION; DISPUTE RESOLUTION

7.01 **Agreement to Arbitrate.** Except as otherwise specifically provided in any Other Agreement, the procedures for discussion, negotiation and arbitration set forth in this Article VII shall apply to all disputes, controversies or claims (whether sounding in contract, tort or otherwise) that may arise out of or relate to, or arise under or in connection with this Agreement or any Other Agreement, or the transactions contemplated hereby or thereby (including all actions taken in furtherance of the transactions contemplated hereby or thereby on or prior to the date hereof), or the commercial or economic relationship of the parties as it relates to this Agreement or such Other Agreement between or among any member of the Monsanto Group and the Chemicals Group. Each party agrees on behalf of itself and each member of its respective Group that the procedures set forth in this Article VII shall be the sole and exclusive remedy in connection with any dispute, controversy or claim relating to any of the foregoing matters and irrevocably waives any right to commence any Action in or before any Governmental Authority, except as expressly provided in Sections 7.07(b) and 7.08 and except to the extent provided under the Arbitration Act in the case of judicial review of arbitration results or awards.

7.02 **Escalation.**

(a) It is the intent of the parties to use their respective reasonable best efforts to resolve expeditiously any dispute, controversy or claim between or among them with respect to the matters covered hereby that may arise from time to time on a mutually acceptable negotiated basis. In furtherance of the foregoing, at the request of either party from time to time in a written notice to the other party, the parties agree to negotiate in good faith to resolve any controversies, claims or disputes under this Agreement or an Other Agreement. If the parties cannot otherwise resolve the matter under consideration, then any party involved in such a dispute, controversy or claim may deliver a notice (an "Escalation Notice") demanding an in-person meeting of the Chief Executive Officers (each, a "CEO") of Monsanto and Chemicals who shall meet with respect to such matters, and who shall thereafter negotiate in good faith with each other. Each party shall deliver, at the same time the Escalation Notice is delivered pursuant to the preceding sentence, a copy of any such Escalation Notice to the General Counsel of each other party involved in the dispute, controversy or claim (which copy shall state that it is an Escalation Notice pursuant to this Agreement). Any agenda, location or procedures for such discussions or negotiations between the parties may be