]

# EXHIBIT C
**CONTINUED (3)**

established by the parties from time to time; provided, however, that the parties shall use their reasonable efforts to meet within 30 days of the delivery of the Escalation Notice.

(b) At any time, the parties may, by mutual consent, retain a mediator to aid the parties in their discussions and negotiations by informally providing advice to the parties. Any opinion expressed by the mediator shall be strictly advisory and shall not be binding on the parties, nor shall any opinion expressed by the mediator be admissible or be made known to the arbitrator in any arbitration proceedings. The mediator may be chosen from a list of mediators previously selected by the parties or by other agreement of the parties. Costs of the mediation shall be borne equally by the parties involved in the matter, except that each party shall be responsible for its own expenses. Mediation is not a prerequisite to a demand for arbitration under Section 7.03.

(c) At any time after the delivery of the Escalation Notice, a party (the "Offeror") may serve upon the other party (the "Offeree") an offer to settle the dispute upon the payment or receipt of a specified sum (the "Offer of Settlement"). If the Offer of Settlement is not accepted within thirty days of receipt of such Offer or within such other longer period of time as may be specified in the Offer of Settlement, if the Offeror made its CEO available for a meeting or discussion and if the award or judgment finally obtained is not more favorable to the Offeree than the Offer of Settlement, the Offeree must pay the costs, including reasonable attorney's fees, incurred by the Offeror after the making of the Offer of Settlement. The fact that an Offer of Settlement is made and not accepted shall not preclude a subsequent offer by either party. The Offer of Settlement shall be designated as such and copies of the Offer of Settlement shall be given to the General Counsel and Chief Executive Officer of each party involved in the dispute. The parties agree to keep confidential and not to disclose to the arbitrator the fact or the amount of any Offer of Settlement made.

### 7.03 Demand for Arbitration.

(a) At any time after the first to occur of (1) forty-five (45) days after the date of the meeting actually held pursuant to the applicable Escalation Notice or (2) ninety (90) days after the delivery of an Escalation Notice (as applicable, the "Arbitration Demand Date"), any party involved in the dispute, controversy or claim may make a written demand (the "Arbitration Demand Notice") that the dispute be resolved by binding arbitration, which Arbitration Demand Notice shall be given to the parties to the dispute, controversy or claim in the manner set forth in Section 10.05. In the event that any party shall deliver an Arbitration Demand Notice to another party, such other party may itself deliver an Arbitration Demand Notice to such first party with respect to any related dispute, controversy or claim without the requirement of delivering an Escalation Notice. No party may assert that the failure to resolve any matter during any discussions or negotiations or the course of conduct during the discussions or negotiations in each case, as contemplated by Section 7.02, is a prerequisite to a demand for arbitration under Section 7.03. In the event that any party delivers an Arbitration Demand Notice with respect to any dispute, controversy or claim that is the subject of any then-pending arbitration proceeding or of a previously delivered Arbitration Demand Notice, all such disputes, controversies and claims shall be resolved in the arbitration proceeding for which an Arbitration Demand Notice was first delivered unless the arbitrator in his or her sole discretion determines that it is impracticable or otherwise inadvisable to do so.

(b) The parties agree that the giving of an Escalation Notice or an Arbitration Demand Notice followed by good faith discussions, negotiations, mediations or arbitration between the parties pursuant to this Agreement or the Other Agreements will toll the applicable statute of limitations during the time period consumed in compliance with this Article VII with respect to such claims. Subject to Sections 7.07(d) and 7.08, upon delivery of an Arbitration Demand Notice pursuant to Section 7.03(a), the dispute, controversy or claim shall be decided by a sole arbitrator in accordance with the rules set forth in this Article VII.

**7.04 Arbitrators.**

(a) Within 15 days after a valid Arbitration Demand Notice is given, the parties involved in the dispute, controversy or claim referenced therein shall attempt to select a sole arbitrator satisfactory to all such parties.

(b) In the event that such parties are not able jointly to select a sole arbitrator within such 15-day period, such parties shall each appoint an arbitrator (who need not be disinterested as to the parties or the matter) within 30 days after delivery of the Arbitration Demand Notice. If one party appoints an arbitrator within such time period and the other party or parties fail to appoint an arbitrator within such time period, the arbitrator appointed by the one party shall be the sole arbitrator of the matter.

(c) In the event that a sole arbitrator is not selected pursuant to paragraph (a) or (b) above and, instead, two arbitrators are selected pursuant to paragraph (b) above, the two arbitrators will, within 30 days after the appointment of the later of them to be appointed, select an additional arbitrator who shall act as the sole arbitrator of the dispute. After selection of such sole arbitrator, the initial arbitrators shall have no further role with respect to the dispute. In the event that the arbitrators so appointed do not, within 30 days after the appointment of the later of them to be appointed, agree on the selection of the sole arbitrator, any party involved in such dispute may apply to CPR, New York, New York to select the sole arbitrator, which selection shall be made by such organization within 30 days after such application. Any arbitrator selected pursuant to this paragraph (c) shall be disinterested with respect to any of the parties and the matter and shall be reasonably competent in the applicable subject matter. In disputes involving the Tax Sharing Agreement the arbitrator appointed shall be either a tax attorney or an independent certified public accountant.

(d) The sole arbitrator selected pursuant to paragraph (a), (b) or (c) above will set a time for the hearing of the matter which will commence no later than 90 days after the date of appointment of the sole arbitrator pursuant to paragraph (a), (b) or (c) above and which hearing will be no longer than 30 days (unless in the judgment of the arbitrator the matter is unusually complex and sophisticated and thereby requires a longer time, in which event such hearing shall be no longer than 90 days). The final award of such arbitrator will be rendered in writing to the parties not later than 60 days after the last hearing date, unless otherwise agreed by the parties in writing.

(e) The place of any arbitration hereunder will be St. Louis, Missouri, unless otherwise agreed by the parties.

7.05 **Hearings.** Within the time period specified in Section 7.04(d), the matter shall be presented to the arbitrator at a hearing by means of written submissions of memoranda and verified witness statements, filed simultaneously, and responses, if necessary in the judgment of the arbitrator or both the parties. The arbitrator shall actively manage the arbitration with a view to achieving a just, speedy and cost-effective resolution of the dispute, claim or controversy. The arbitrator may, in his or her discretion, set time and other limits on the presentation of each party's case, its memoranda or other submissions, and refuse to receive any proffered evidence which the arbitrator, in his or her discretion, finds to be cumulative, unnecessary, irrelevant or of low probative nature. Except as otherwise set forth herein, any arbitration hereunder will be conducted in accordance with the CPR Rules for Non-Administered Arbitration of Business Disputes then prevailing (except that the fee schedule of CPR will not apply unless CPR selects the arbitrator in which event the relevant CPR Fee Schedule will apply). Except as expressly set forth in Section 7.08(b), the decision of the arbitrator will be final and binding on the parties, and judgment thereon may be had and will be enforceable in any court having jurisdiction over the parties. Arbitration awards will bear interest from the date of the arbitration award at an annual rate of the Prime Rate per annum. To the extent that the provisions of this Agreement and the prevailing rules of the CPR conflict, the provisions of this Agreement shall govern.

### 7.06 Discovery and Certain Other Matters.

(a) In addition to its rights of access to Information under Article VI of this Agreement and any other rights to Information provided for in this Agreement or an Other Agreement, any party involved in the applicable dispute may request limited document production from the other party or parties at any time following the original meeting request of relevant documents containing Information developed after the Distribution Date and which Information would not otherwise be available under Article VI, with the reasonable expenses of the producing party incurred in such production paid by the requesting party. Any such discovery (which rights to documents shall be substantially less than document discovery rights prevailing under the Federal Rules of Civil Procedure) shall be conducted expeditiously and shall not cause the hearing provided for in Section 7.05 to be adjourned except upon consent of all parties involved in the applicable dispute or upon a showing of cause demonstrating that such adjournment is necessary to permit discovery essential to a party to the proceeding. Depositions, interrogatories or other forms of discovery (other than the document production set forth above) shall not occur except by consent of the parties involved in the applicable dispute. Disputes concerning the scope of document production and enforcement of the document production requests will be determined by written agreement of the parties involved in the applicable dispute or, failing such agreement, will be referred to the arbitrator for resolution. All discovery requests for Information developed after the Distribution Date will be subject to the parties' rights to claim any applicable privilege. In addition to the parties confidentiality and restricted use obligations with respect to Information contained in this Agreement or the applicable Other Agreement, the arbitrator will adopt procedures to protect the proprietary rights of the parties and to maintain the confidential treatment of the arbitration proceedings (except as may be required by law). Subject to the foregoing, the arbitrator shall have the power to issue subpoenas to compel the production of documents relevant to the dispute, controversy or claim.

(b) The arbitrator shall have full power and authority to determine issues of arbitrability but shall otherwise be limited to interpreting or construing the applicable provisions of this Agreement or any Other Agreement, and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of this Agreement or any Other Agreement; it being understood, however, that the arbitrator will have full authority to implement the provisions of this Agreement or any Other Agreement, and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief); provided that the arbitrator shall not have (1) any authority in excess of the authority a court having jurisdiction over the parties and the controversy or dispute would have absent these arbitration provisions or (2) any right or power to award punitive or treble damages. It is the intention of the parties that in rendering a decision the arbitrator give effect to the applicable provisions of this Agreement and the Other Agreements and follow applicable law (it being understood and agreed that this sentence shall not give rise to a right of judicial review of the arbitrator's award).

(c) If a party fails or refuses to appear at and participate in an arbitration hearing after due notice, the arbitrator may hear and determine the controversy upon evidence produced by the appearing party.

(d) Arbitration costs will be borne equally by each party involved in the matter, except that each party will be responsible for its own attorney's fees and other costs and expenses, including the costs of witnesses selected by such party. Provided, however, that if an arbitration or court action is commenced without a meeting of or discussion between the CEO's, the party who did not make its CEO available for such meeting or discussion will pay all costs of the arbitration or litigation. In addition, the arbitrator (or the Court in any action under Article 7.08 or any action to enforce the award) shall be entitled in his or her discretion to award reasonable attorney's fees to the prevailing party if the arbitrator (or the Court) finds that the other party did not make its CEO available for a meeting and that party (a) has asserted claims or defenses that are frivolous or (b) has unnecessarily and unreasonably expanded the scope of the proceedings.

### 7.07 Certain Additional Matters.

(a) Any arbitration award shall be a bare award limited to a holding for or against a party and shall be without findings as to facts, issues or conclusions of law (including with respect to any matters relating to the validity or infringement of patents or patent applications) and shall be without a statement of the reasoning on which the award rests, but must be in adequate form so that a judgment of a court may be entered thereupon. Judgment upon any arbitration award hereunder may be entered in any court having jurisdiction thereof.

(b) Prior to the time at which an arbitrator is appointed pursuant to Section 7.04, any party may seek one or more temporary restraining orders in a court of competent jurisdiction if necessary in order to preserve and protect the status quo. Neither the request for, or grant or denial of, any such temporary restraining order shall be deemed a waiver of the obligation to arbitrate as set forth herein.

(c) Except as required by law, the parties shall hold, and shall cause their respective officers, directors, employees, agents and other representatives to hold, the existence, content and

result of mediation or arbitration in confidence in accordance with the provisions of Article VI and except as may be required in order to enforce any award. Each of the parties shall request that any mediator or arbitrator comply with such confidentiality requirement.

(d) In the event that at any time the sole arbitrator shall fail to serve as an arbitrator for any reason, the parties shall select a new arbitrator who shall be disinterested as to the parties and the matter in accordance with the procedures set forth herein for the selection of the initial arbitrator. The extent, if any, to which testimony previously given shall be repeated or as to which the replacement arbitrator elects to rely on the stenographic record (if there is one) of such testimony shall be determined by the replacement arbitrator.

**7.08 Limited Court Actions.**

(a) Notwithstanding anything herein to the contrary, in the event that any party reasonably determines the amount in controversy in any dispute, controversy or claim (or any series of related disputes, controversies or claims) under this Agreement or any Other Agreement is, or is reasonably likely to be, in excess of $10 million and if such party desires to commence an Action in lieu of complying with the arbitration provisions of this Article, such party shall so state in its Arbitration Demand Notice or by notice given to the other parties within 20 days after receipt of an Arbitration Demand Notice with respect thereto. If the other parties to the arbitration do not agree that the amount in controversy in such dispute, controversy or claim (or such series of related disputes, controversies or claims) is, or is reasonably likely to be, in excess of $10 million, the arbitrator selected pursuant to Section 7.04 hereof shall decide whether the amount in controversy in such dispute, controversy or claim (or such series of related disputes, controversies or claims) is, or is reasonably likely to be, in excess of $10 million. The arbitrator shall set a date that is no later than ten days after the date of his or her appointment for submissions by the parties with respect to such issue. Except for a party's rights of access to Information as provided in this Agreement and the Other Agreements, there shall not be any discovery in connection with such issue. The arbitrator shall render his or her decision on such issue within five days of such date so set by the arbitrator. In the event that the arbitrator determines that the amount in controversy in such dispute, controversy or claim (or such series of related disputes, controversies or claims) is or is reasonably likely to be in excess of $10 million, the provisions of Sections 7.04(d) and (e), 7.05, 7.06, 7.07 and 7.10 hereof shall not apply and on or before (but, except as expressly set forth in Section 7.08(b), not after) the tenth business day after the date of such decision, any party to the arbitration may elect, in lieu of arbitration, to commence an Action with respect to such dispute, controversy or claim (or such series of related disputes, controversies or claims) in any court of competent jurisdiction. If the arbitrator does not so determine, the provisions of this Article VII (including with respect to time periods) shall apply as if no determinations were sought or made pursuant to this Section 7.08(a).

(b) In the event that an arbitration award in excess of $10 million is issued in any arbitration proceeding commenced hereunder, any party may, within 60 days after the date of such award, commence an Action in a court of competent jurisdiction relating to the dispute, controversy or claim (or series of related disputes, controversies or claims) giving rise thereto to a court of competent jurisdiction, regardless of whether such party or any other party sought to commence an Action in lieu of proceeding with arbitration in accordance with Section 7.08(a). In such event,

-39-

each party may present arguments to the court with respect to whether and to what extent the record developed in arbitration shall be admissible into evidence and whether any such additional discovery or evidence shall be permitted.

(c) No party shall raise as a defense the statute of limitations or repose or a claim of laches if the applicable Notice of Escalation was delivered on or prior to the applicable statute of limitations or repose or the time period required to assert a claim of laches and, if applicable, if the matter is submitted to a court of competent jurisdiction within the 60-day period specified in Section 7.08(b).

7.09 **Continuity of Service and Performance.** Unless otherwise agreed in writing, the parties will continue to provide service and honor all other commitments under this Agreement and each Other Agreement during the course of dispute resolution pursuant to the provisions of this Article VII with respect to all matters not subject to such dispute, controversy or claim.

7.10 **Law Governing Arbitration Procedures.** The interpretation of the provisions of this Article VII, only insofar as they relate to the agreement to arbitrate and any procedures pursuant thereto, shall be governed by the Arbitration Act and other applicable federal law. In all other respects, the interpretation of this Agreement shall be governed as set forth in Section 10.04.

## ARTICLE VIII

## NO REPRESENTATIONS OR WARRANTIES; EXCEPTIONS

8.01 **No Representations or Warranties; Exceptions.** Chemicals understands and agrees that no member of the Monsanto Group is, in this Agreement or in any Other Agreement, representing or warranting to the Chemicals Group in any way as to the Chemicals Assets, the Chemicals Liabilities, the Chemicals Business, the Former Chemicals Business or the Chemicals Balance Sheet, or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement, it being agreed and understood as between the Groups, the members of the Chemicals Group shall take all of the Chemicals Assets "as is, where is" and that, except as provided in this Section 8.01 or in Section 5.01, the members of Chemicals Group shall bear the economic and legal risk that conveyances of the Chemicals Assets shall prove to be insufficient or that the title of any member of the Chemicals Group to any Chemicals Assets shall be other than good and marketable and free from encumbrances. Real property in the United States being transferred to Chemicals will be conveyed by Special Warranty Deed, in recordable form and warranting title to be free and clear from all lawful claims of those claiming by, through or under Monsanto, but not otherwise; provided, however, such Special Warranty Deed shall be subject to deed restrictions, easements, rights-of-way, and all other matters of record.

## ARTICLE IX

## INSURANCE

### 9.01 Insurance Policies and Rights.

(a) Without limiting the generality of the definition of Chemicals Assets set forth in Section 1.01 or the effect of Section 2.03, the Chemicals Assets shall include any and all rights of an insured party, including rights of indemnity and the right to be defended by or at the expense of the insurer with respect to all Chemicals Claims, under any Insurance Policies; provided, however, that nothing in this clause shall be deemed to constitute (or to reflect) the assignment to Chemicals of any of the Insurance Policies. Except for Insurance Proceeds paid to or on behalf of any member of the Monsanto Group at the direction of Chemicals in satisfaction of a claim that would otherwise be subject to indemnification by Chemicals under Article IV but subject to the provisions of Section 4.03(c), and except for reimbursement received by Monsanto for Chemicals Claims which are Monsanto Liabilities and were paid by the Monsanto Group after the Distribution Date, Chemicals shall be entitled to receive from the insurer or Monsanto any Insurance Proceeds with respect to any Chemicals Claim under the Insurance Policies including without limitation, reimbursement or payment for Chemicals Liabilities, for casualty or business interruption with respect to the Chemicals Business or the Chemicals Assets, or for costs or expenses related thereto.

(b) Without limiting the generality of the definition of Monsanto Assets set forth in Section 1.01, the Monsanto Assets shall include any and all rights of an insured party including rights of indemnity and the right to be defended by or at the expense of the insurer, under any Insurance Policies other than the rights under the Insurance Policies which are included in Chemicals Assets pursuant to Section 9.01(a). Such rights include claims with respect to the Joint Ownership Properties or the P4 Business to the extent of Monsanto's rights or obligations under the P4 Joint Venture Agreement with respect to such claims.

(c) Solely for purposes of this Article IX, "Monsanto Group" and "Chemicals Group" shall include their consolidated entities to the extent such entities were in existence on or prior to the Distribution Date or are set forth on Schedule 1.01(21).

### 9.02 Claims.

(a) The parties agree that on or prior to the Distribution Date, Monsanto shall be deemed: (i) to have assigned to the Chemicals Group, without need of further documentation, all of the Monsanto Group's rights, if any, as an insured party, including rights of indemnity and the right to be defended by or at the expense of the insurer, under all of the Insurance Policies with respect to such Chemicals Claims as are pending on the Distribution Date, and (ii) to the extent necessary to provide the Chemicals Group with the benefit of such insurance with respect to Chemicals Claims, to designate Chemicals, without need of further documentation, as the agent and attorney-in-fact to assert and to collect any Insurance Proceeds under such Insurance Policies; provided, however, that nothing in this Section 9.02 shall be deemed to constitute (or reflect) the assignment of any of the Insurance Policies to the Chemicals Group. If, subsequent to the Distribution Date, the Chemicals Group shall be entitled to payment or reimbursement with respect to a Chemicals Claim or any

Person shall assert a Chemicals Claim, then Monsanto shall at the time such Chemicals Claim arises or is asserted be deemed: (i) to assign, without need of further documentation, to the Chemicals Group all of the Monsanto Group's rights, if any, as an insured party, including rights of indemnity and the right to be defended by or at the expense of the insurer, under the applicable Insurance Policy with respect to such Chemicals Claim; and (ii) to the extent necessary to provide the Chemicals Group with the benefit of such insurance with respect to Chemicals Claims, to designate Chemicals, without need of further documentation, as the agent and attorney-in-fact to assert and to collect any Insurance Proceeds under such Insurance Policies, provided, however, that nothing in this Section 9.02 shall be deemed to constitute (or to reflect) the assignment of any of the Insurance Policies to the Chemicals Group. In the event an insurer refuses to honor such agency or to pay such Insurance Proceeds to the Chemicals Group, Monsanto shall collect such Insurance Proceeds and forward it to Chemicals.

(b) In the event of payment of a Chemicals Claim by the Chemicals Group after the Distribution Date or any payment of a Chemicals Claim prior to the Distribution Agreement which is subject to reimbursement or payment by an insurer or a Third Party, Chemicals, or the applicable member of the Chemicals Group shall be subrogated to and stand in the place of Monsanto or the Monsanto Group as to any rights, events or circumstances in respect of which Chemicals or the applicable member of the Chemicals Group may have any right or claim under this Agreement, any Other Agreement or otherwise against any such insurer or Third Party relating to such Chemicals Claim. Monsanto shall cooperate with the Chemicals Group in a reasonable manner in prosecuting any subrogated right or claim, including granting Chemicals permission to sue in the name of Monsanto.

9.03 Administration and Reserves. Consistent with the provisions of Article IV, from and after the Distribution Date:

(a) Monsanto shall be responsible for (1) Insurance Administration of the Insurance Policies with respect to any Monsanto Liabilities, any Monsanto Assets or any claims as to which the Monsanto Group has retained rights of reimbursement or subrogation pursuant to this Agreement or any Other Agreement; and (2) Claims Administration with respect to any Monsanto Liabilities, any Monsanto Assets or any claims as to which the Monsanto Group has retained rights of reimbursement or subrogation pursuant to this Agreement or any Other Agreement. It is understood that the retention of the Insurance Policies by Monsanto is in no way intended to limit, inhibit or preclude any right to insurance coverage for any Insured Claim or any other rights under the Insurance Policies, including without limitation, claims of Chemicals and any of its operations, Subsidiaries and Affiliates for insurance coverage, reimbursement, subrogation or otherwise; and

(b) Chemicals shall be responsible for (1) Insurance Administration of the Insurance Policies with respect to any Chemicals Liabilities, any Chemicals Assets, or any claims as to which the Chemicals Group has rights of reimbursement or subrogation pursuant to this Agreement or any Other Agreement, and (2) Claims Administration with respect to any Chemicals Liabilities, any Chemicals Assets, or any claims as to which the Chemicals Group has rights of reimbursement or subrogation pursuant to this Agreement or an Other Agreement. Subject to the terms of the Transition Services Agreement, Monsanto

shall perform the Insurance Administration and provide assistance to the Chemicals Group with respect to Claims Administration for claims as to which Chemicals or the Chemicals Group has rights or obligations hereunder as part of the insurance and risk management services it will perform for the Chemicals Group after the Distribution Date.

9.04 **Retrospectively Rated Insurance Premiums.** Each party shall pay its share of retrospectively rated premiums incurred after the Distribution Date for coverage under the Insurance Policies with respect to their respective Liabilities which are Insured Claims under the Insurance Policies. Such shares will be determined consistent with the accounting principle in effect on the Distribution Date which was used to determine shares of such retrospectively rated premiums prior thereto. Either party shall have the right but not the obligation to pay such premiums under the Insurance Policies with respect to the other party's Liabilities which are Insured Claims under the Insurance Policies to the extent that such other party does not pay such premiums, whereupon the non-paying party shall forthwith reimburse the payor for any premiums paid by the payor with respect to such non-paying party's Liabilities.

9.05 **Allocation of Insurance Proceeds; Cooperation.** (a) Except as otherwise provided in Section 4.03(c), Insurance Proceeds received with respect to claims, costs and expenses under the Insurance Policies shall be paid to Monsanto with respect to Monsanto Liabilities and to Chemicals with respect to the Chemicals Liabilities. Payment of the allocable portions of indemnity costs of Insurance Proceeds resulting from the Insurance Policies will be made to the appropriate party upon receipt from the insurance carrier.

(b) Each of the parties hereto agree to use commercially reasonable efforts to maximize available coverage under the Insurance Policies for all Insured Claims whether or not such party is the expected beneficiary of Insurance Proceeds under such Insurance Policies in respect of such Insured Claim. As part of such efforts to maximize insurance coverage, each party agrees to take all commercially reasonable steps to recover such amounts as are or might be due from all other responsible parties in respect of an Insured Claim, including but not limited to Insured Claims as to which coverage limits under the Insurance Policies would be or would have been exceeded as a result of such Insured Claim and whether or not such party is expected to benefit directly from such efforts.

(c) Where Monsanto Liabilities and Chemicals Liabilities, as applicable, are covered under the same Insurance Policies for periods prior to the Distribution Date, or covering claims made after the Distribution Date with respect to an event or an occurrence prior to the Distribution Date, then the Monsanto Group and the Chemicals Group may claim coverage for Insured Claims under such Insurance Policies as and to the extent that such insurance is available up to the full extent of the applicable limits of liability or other coverage of such Insurance Policies. Each party may receive Insurance Proceeds in respect of its Insured Claims as and when payable under the terms of the applicable Insurance Policies without regard to whether the Insured Claim covers a Monsanto Liability or claim or a Chemicals Liability or claim, the relative amount of deductible paid by either party after the Distribution Date with respect to an Insured Claim for a Liability for which such party was responsible or the amount of such Insurance Proceeds paid to either Group after the Distribution Date with respect to its respective Liabilities. In the event that the aggregate limits on any Insurance Policy is exceeded by the aggregate of paid Insured Claims,

there shall be no further allocation of previously paid deductibles, premiums or Insurance Proceeds between the Groups and except as expressly provided in this Agreement, neither Group shall be entitled to reimbursement from the other Group for deductibles, premiums or Insurance Proceeds paid by an insurer to or on behalf of such Group; provided, however, that in the event additional insurance coverage for remaining unpaid Insured Claims may be purchased or reinstated, the parties agree to share such costs of reinstatement (including premium penalty adjustments) in the same proportion which the Insurance Proceeds under such Insurance Policy (both received and expected to be received by such party after the Distribution Date less deductible paid by such party after the Distribution Date) bears to the total Insurance Proceeds paid (and payable to the party with the pending claims under the new coverage limits).

9.06 **Reimbursement of Expenses.** Chemicals shall reimburse the relevant insurer or the relevant third-party administrator, to the extent required under any Insurance Policy or Service Agreement for any services performed after the Distribution Date with respect to any and all Chemicals Claims which are not Monsanto Liabilities which are paid, settled, adjusted, defended and/or otherwise handled by such insurer or third-party administrator pursuant to the terms and conditions of such Insurance Policy or Service Agreement.

9.07 **Insurer Insolvency.** Except for Chemicals Claims which are Monsanto Liabilities or as otherwise provided in this Agreement, the Monsanto Group shall not be obligated to reimburse the Chemicals Group for any Chemicals Claim covered under any Insurance Policies which is not paid because of the insolvency of such insurer or the refusal by any insurer to pay such Chemicals Claim; provided, however, that Monsanto shall assign to Chemicals or any member of the Chemicals Group all of its rights under such Insurance Policies with respect to such Chemicals Claim and shall cooperate with Chemicals, at Chemicals' option and expense, in pursuing collection of all or part of such Chemicals Claim from such insurer or such other Third Parties who may have liability for such Chemicals Claim (including without limitation, Governmental Authorities, or others holding insurance reserves available for payment, trustees in bankruptcy or liquidators of such insurers, etc.).

9.08 **Direct Responsibility for Claims.** Monsanto agrees to notify insurers under the Insurance Policies of the Distribution and to seek an endorsement by such insurers that the coverage provided by such Insurance Policies will apply to the Monsanto Group and the Chemicals Group with the same force and effect and subject to the same terms, conditions, and exclusions as if the separation of Monsanto and the Distribution had not occurred. In the event such endorsement is refused, Monsanto agrees to take such action as is necessary to place the Chemicals Group in the same position as it would have been had such endorsement been agreed upon by such insurers. Chemicals shall have the right to make reasonable efforts to negotiate agreements with any and all insurers or third-party administrators whereby Chemicals shall assume direct responsibility for any and all Liabilities related to it under any Insurance Policies and/or Service Agreements, and Monsanto shall provide reasonable assistance in this effort.

9.09 **No Reduction of Coverage.** Except for such reduction in coverage resulting from payment of claims paid in accordance with this Agreement or any Other Agreement, neither party shall take any action to eliminate or reduce coverage under any Insurance Policy or Service

Agreement for any claims without the prior written consent of the other party (which shall not be unreasonably withheld or delayed).

    9.10 **Assistance, Waiver of Conflict and Shared Defense.** Each of the parties hereto agrees to provide reasonable assistance to the other parties hereto as regards any dispute with any third party (including insurers, third-party administrators and state guaranty funds) as to any matter related to the Insurance Policies or Service Agreements. In the event that Insured Claims of more than one Group exist relating to the same occurrence, the parties hereto agree to defend such Insured Claims jointly and to waive any conflict of interest necessary to the conduct of such joint defense. Nothing in this Section 9.10 shall be construed to limit or otherwise alter in any way the indemnity obligations of the parties hereto, including those created by this Agreement or by operation of law.

## ARTICLE X

## MISCELLANEOUS

  10.01 **Conditions to Obligations.**

    (a) The obligations of the parties hereto to consummate the Distribution are subject to the satisfaction, as determined by Monsanto in its sole discretion, of each of the following conditions:

    (1) The Distribution shall have been approved by the holders of a majority of the shares of Monsanto Common Stock present in person or by proxy at the Special Meeting;

    (2) The Monsanto Certificate Amendment shall have been approved by the holders of a majority of the outstanding shares of Monsanto Common Stock;

    (3) The transactions contemplated by Sections 2.01, 2.02, 2.05 and 2.06 shall have been consummated and the transactions contemplated by Section 2.03 shall have been consummated in all material respects;

    (4) The Chemicals Common Stock shall have been approved for listing on the NYSE, subject to official notice of issuance;

    (5) The Registration Statement shall have been filed with the SEC and shall have become effective, and no stop order with respect thereto shall be in effect;

    (6) All material authorizations, consents, approvals and clearances of federal, state, local and foreign governmental agencies required to permit the valid consummation by the parties hereto of the transactions contemplated by this Agreement shall have been obtained; and no such authorization, consent, approval or clearance shall contain any conditions which would have a material adverse effect on (A) the Monsanto Business or the Chemicals Business, (B) the Assets, results of operations or financial condition of the Monsanto Group

or the Chemicals Group, in each case taken as a whole, or (C) the ability of Monsanto or Chemicals to perform its obligations under this Agreement; and all statutory requirements for such valid consummation shall have been fulfilled.

(7) No preliminary or permanent injunction or other order, decree or ruling issued by a court of competent jurisdiction or by a government, regulatory or administrative agency or commission, and no statute, rule, regulation or executive order promulgated or enacted by any governmental authority, shall be in effect preventing the consummation of the Distribution;

(8) The Financing Facility shall be in place and all conditions to borrowing thereunder (other than any conditions concerning consummation of the Distribution and the transfers of assets and liabilities described hereunder) shall have been satisfied, and all necessary consents, waivers or amendments to each bank credit agreement, debt security or other financing facility to which any member of the Monsanto Group or the Chemicals Group is a party or by which any such member is bound shall have been obtained, or each such agreement, security or facility shall have been refinanced, in each case on terms satisfactory to Monsanto and to the extent necessary to permit the Distribution to be consummated without any material breach of the terms of such agreement, security or facility; and

(9) Monsanto shall have received a ruling from the Internal Revenue Service that the Distribution is tax-free for federal income tax purposes, and such ruling shall be in form and substance satisfactory to Monsanto in its sole discretion.

(b) The foregoing conditions are for the sole benefit of Monsanto and shall not give rise to any duty on the part of Monsanto or its Board of Directors to waive or not waive any such condition. Any determination made by the Board of Directors of Monsanto in good faith on or prior to the Distribution Date concerning the satisfaction or waiver of any or all of the conditions set forth in Section 10.01(a) shall be conclusive.

10.02 **Complete Agreement.** This Agreement, the Exhibits and Schedules hereto, the Other Agreements and the agreements and other documents referred to herein shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede all previous negotiations, commitments and writings with respect to such subject matter, including without limitation, the "Spin Principles".

10.03 **Expenses.** All costs and expenses of any party hereto whether incurred prior to or after the Distribution Date in connection with the preparation, execution, delivery and implementation of this Agreement and with the consummation of the transactions contemplated by this Agreement and the Other Agreements, including but not limited to legal fees, accounting fees, investment banking fees, and all such other costs and expenses shall be charged to and paid by Monsanto. Monsanto will contribute to Chemicals all intangible assets relating to Chemicals' investigatory, pre-opening, start-up and organizational expenditures which are required to be capitalized for federal income tax purposes.

10.04  **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflicts of laws) as to all matters, including matters of validity, construction, effect, performance and remedies.

10.05  **Notices.**  All notices, requests, claims, demands and other communications hereunder (collectively, "Notices") shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, facsimile, electronic mail or other standard form of telecommunications (provided confirmation is delivered to the recipient the next Business Day in the case of facsimile, electronic mail or other standard form of telecommunications) or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Monsanto: | Robert W. Reynolds, Corporate Vice President<br>Monsanto Company<br>800 North Lindbergh Boulevard<br>St. Louis, MO 63167<br>Telephone: 314-694-4179<br>Facsimile: 314-694-4105 |
| with a copy to: | General Counsel<br>Monsanto Company<br>800 North Lindbergh Boulevard<br>St. Louis, MO 63167<br>Telephone: 314-694-9322<br>Facsimile: 314-694-6399 |
| If to Chemicals: | President<br>G Building<br>Solutia Inc.<br>10300 Olive Boulevard<br>P.O. Box 66760<br>St. Louis, MO 63166-6760<br>Telephone: 314-674-2210<br>Facsimile: 314-674-8425 |
| with a copy to: | General Counsel<br>G Building<br>Solutia Inc.<br>10300 Olive Boulevard<br>St. Louis, MO 63166-6760<br>Telephone: 314-674-3586<br>Facsimile: 314-674-2721 |

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section 10.05.

10.06 **Amendment and Modification.** This Agreement may be amended, modified or supplemented only by a written agreement signed by both of the parties hereto.

10.07 **Successors and Assigns; No Third Party Beneficiaries.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed). Except for the provisions of Sections 4.03 and 4.04 relating to Indemnities, which are also for the benefit of the Indemnitees, this Agreement is solely for the benefit of the parties hereto and their Subsidiaries and Affiliates and is not intended to confer upon any other Persons any rights or remedies hereunder.

10.08 **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.09 **Interpretation.** The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

10.10 **Legal Enforceability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Each party acknowledges that money damages would be an inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations of the parties hereunder shall be specifically enforceable.

10.11 **References; Construction.** References to any "Article", "Exhibit", "Schedule" or "Section", without more, are to Appendices, Articles, Exhibits, Schedules and Sections to or of this Agreement. Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

10.12 **Termination.** Notwithstanding any provision hereof this Agreement may be terminated and the Distribution abandoned at any time prior to the Distribution Date by and in the sole discretion of the Board of Directors of Monsanto without the approval of any other party hereto or of Monsanto's stockholders. In the event of such termination, no party hereto shall have any Liability to any Person by reason of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

MONSANTO COMPANY,
a Delaware corporation

By: _____
Nicholas L. Reding
Vice Chairman


SOLUTIA INC.
a Delaware corporation

By: _____
John C. Hunter III
President

-49-

DISTRIBUTION AGREEMENT
BETWEEN
MONSANTO COMPANY
AND

SOLUTIA INC.

DATED AS OF SEPTEMBER 1, 1997

SCHEDULE 1.01(36)(a)

FORMER CHEMICALS BUSINESS:
DISCONTINUED BUSINESSES

<u>Chemicals</u>

Chemical Intermediates (see Note #1 below)
Building Block Chemicals (see Note #1 below)
Basic Chemicals (e.g., sulfuric Acid)
(See Note #1 below)
Process Chemicals (see Note #1 below)
Petrochemicals
Rubber Chemicals and Rubber Instruments
Functional Fluids
Paper Chemicals (Other than those
  listed under Life Sciences
Flavor and Essence Chemicals
Phosphates

Fibers and Resins; Textiles
Plasticizers
Polymers and Elastomers
Resin/Plastic Based Consumer Products,
  incl. containers, film, Fome-Cor, turf,
  doormats, mudflaps, etc.
Oil Additives
Wood or Bone Based Products
Analgesics (Aspirin and APAP)
Fine/Aroma Chemicals
Ammonia

Note#1: "Chemical Intermediates", "Building Block Chemicals", "Basic Chemicals" and "Process Chemicals" that are exclusively or predominantly manufactured as intermediates for the subsequent manufacture of Life Sciences products are also assigned to Life Sciences. (e.g., liabilities associated with Basic Chemicals such as Nitric Acid produced at Luling are assigned to Life Sciences; whereas liabilities associated with Basic Chemicals produced at Pensacola are assigned to Chemicals. Liabilities associated with a toll conversion of Basic Chemicals will be assigned to the entity arranging for the toll.)

Sch 1.01(36)(a)

EXECUTION COPY

AMENDMENT

TO

DISTRIBUTION AGREEMENT

THIS AMENDMENT TO DISTRIBUTION AGREEMENT, dated as of July 1, 2002 (this "Amendment"), is made and entered into by and among Pharmacia Corporation, a Delaware corporation, Solutia Inc., a Delaware corporation ("Solutia"), and Monsanto Company, a Delaware corporation.

WITNESSETH:

WHEREAS, Former Monsanto (as defined below) and Solutia are parties to that certain Distribution Agreement, dated as of September 1, 1997 (the "Distribution Agreement"), which was entered into in connection with the distribution of the common stock of Solutia to the stockholders of Former Monsanto (the "Solutia Distribution");

WHEREAS, pursuant to the Distribution Agreement, among other things, Former Monsanto assigned and transferred the Chemical Assets (as defined in the Distribution Agreement) to Solutia and Solutia assumed all of the Chemical Liabilities (as defined in the Distribution Agreement) of Former Monsanto;

WHEREAS, pursuant to that certain Agreement and Plan of Merger, dated as of December 19, 1999 (the "Merger Agreement"), by and among the former Monsanto Company (which is the Delaware corporation identified in the introductory paragraph of this Amendment as "Pharmacia Corporation" and which is referred to herein as either "Former Monsanto" or "Pharmacia," as the context requires), MP Sub, Incorporated ("Merger Sub") and Pharmacia & Upjohn, Inc. ("PNU"), the parties agreed that Merger Sub would be merged with and into PNU with PNU surviving as a wholly owned subsidiary of Former Monsanto in the merger (the "Merger");

WHEREAS, on February 9, 2000, the new Monsanto Company (which is the Delaware corporation identified in the introductory paragraph of this Amendment as "Monsanto Company" and which is referred to herein as "New Monsanto") was incorporated as a wholly owned subsidiary of Former Monsanto under the name "Monsanto Ag Company;"

WHEREAS, on March 31, 2000, (i) the Merger was effective, (ii) Former Monsanto changed its name from "Monsanto Company" to "Pharmacia Corporation," and (iii) New Monsanto changed its name from "Monsanto Ag Company" to "Monsanto Company;"

WHEREAS, on September 1, 2000, New Monsanto and Pharmacia entered into certain agreements, including that certain Separation Agreement, dated as of September 1, 2000

CHI 2445735v6

JUL. 1. 2002 12:25PM

(the "Separation Agreement"), pursuant to which, among other things, Pharmacia assigned and transferred certain assets related to its chemicals and agricultural businesses and certain other assets to New Monsanto and New Monsanto assumed certain liabilities relating thereto and all liabilities that were assumed by Solutia or any of its subsidiaries in connection with the Solutia Distribution to the extent that Solutia fails to pay, perform or discharge such liabilities;

WHEREAS, on or about October 23, 2000, New Monsanto completed an initial public offering of its common stock in which New Monsanto sold approximately 15% of its issued and outstanding shares of common stock to the public;

WHEREAS, Pharmacia currently owns approximately 84% of the issued and outstanding shares of common stock of New Monsanto;

WHEREAS, Pharmacia has announced its intention to distribute its entire ownership interest in New Monsanto to the stockholders of Pharmacia or could take some other action that will result in Pharmacia no longer controlling New Monsanto (a "Possible Disposition"); and

WHEREAS, in light of the Possible Disposition, the parties hereto desire to enter into this Amendment in order to effectuate the assignment to New Monsanto of certain assets and liabilities contemplated pursuant to the Separation Agreement (including the Distribution Agreement) and preserve the relationship among the parties as nearly as possible with the original intent and purpose of the Distribution Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

Section 1. Each capitalized term used in this Amendment and not otherwise defined herein shall have the meaning ascribed thereto in the Distribution Agreement.

Section 2. The parties hereto hereby agree that effective as of the date of this Amendment the Distribution Agreement is hereby amended in accordance with the requirements of Section 10.06 thereof as follows:

(a) New Monsanto shall be deemed to be and shall be for all purposes a party to the Distribution Agreement as amended hereby.

(b) All references to "party" or "parties" in the Distribution Agreement shall include New Monsanto and all such references to "party" or "parties" in the Distribution Agreement shall be read and construed in the context that New Monsanto is a party to the Distribution Agreement (e.g. "both parties" shall be deemed to mean and shall be read as "all parties").

(c) Subsection 63 of Section 1.01 of the Distribution Agreement is hereby amended to read in its entirety as follows:

"63. MONSANTO GROUP: Collectively, (i) Pharmacia Corporation, a Delaware corporation ("Pharmacia"), and its

2

CHI 2443735v6

JUL. 1. 2002 12:23PM

Subsidiaries of which Pharmacia directly owns 100% of the stock or other equity interests entitled to vote on the election of members to the board of directors or similar governing body, other than members of the Chemical Group, and (ii) Monsanto Company, a Delaware corporation incorporated February 9, 2000 ("New Monsanto"), and its Subsidiaries of which New Monsanto directly owns 100% of the stock or other equity interest entitled to vote on the election of members to the board of directors or similar governing body."

(d) (i) The term "Monsanto" solely as used in Sections 4.03(a)(i), 4.03(b), 4.03(e), 5.01(c), 5.09, 6.01, 6.06, 6.07 and 7.02(a) shall mean: "Pharmacia and New Monsanto" or "Pharmacia or New Monsanto," as the context shall require. Without limiting the generality of the foregoing, but for purposes of example, with respect to those Sections specified in the preceding sentence "Monsanto" shall mean "Pharmacia and New Monsanto" in those contexts where "Monsanto" has a commitment, duty, liability or obligation and shall mean "Pharmacia or New Monsanto" in those contexts where "Monsanto" has a right or interest or where Chemicals, Chemicals Group or any of their respective Affiliates, Representatives or agents has a commitment, duty, liability or obligation.

(ii) For purposes of clarity, the term "Monsanto" solely as used in Articles I, II, III, VIII and IX and Sections 4.03(a)(ii), 4.03(a)(iii), 5.01(b), 5.01(d), 5.01(e), 5.03, 5.04, 5.05, 5.10, 10.01, 10.03 and 10.12 shall not be affected by this Section 2(d) (i.e. shall continue to refer exclusively to Former Monsanto (now Pharmacia)).

(iii) Nothing in this Section 2(d) is intended to limit or otherwise affect the provisions of Sections 2(a) or (b) of this Amendment.

(e) Section 10.05 of the Distribution Agreement is hereby amended to read in its entirety as follows:

"10.05 Notices. All notices, requests, claims, demands and other communications hereunder (collectively, "Notices") shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, facsimile, electronic mail or other standard form of telecommunications (provided confirmation is delivered to the recipient the next Business day in the case of facsimile, electronic mail or other standard form of telecommunications) or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Pharmacia: Christopher Coughlin
Executive Vice President and CFO
Pharmacia Corporation
100 Route 206 North
Peapack, New Jersey 07977

3

CHI 2443735v6