```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MICHAEL ABBATIELLO, et al.,        :
                                   :    06 Civ. 0266 (VM)
                   Plaintiffs,     :
_____:____
        - against -                :
                                   :
MONSANTO COMPANY, SOLUTIA, INC.,   :
and PHARMACIA CORPORATION,         :
                                   :
                   Defendants.     :
----------------------------------X
ALAN ABELE, et al.,                :
                                   :    06 Civ. 3461 (VM)
                   Plaintiffs,     :
_____:____
        - against -                :
                                   :
MONSANTO COMPANY, SOLUTIA, INC.,   :
and PHARMACIA CORPORATION,         :
                                   :
                   Defendants.     :
----------------------------------X
ARMAND CORLEW, VINCENT RIGGI,      :
STEPHEN CERNAK, JR., and RUTH      :    07 Civ. 3258 (VM)
DEPAOLO, individually and on       :
behalf of a class similarly        :
situated,                          :
                   Plaintiffs,     :
_____:    DECISION AND ORDER
        - against -                :
                                   :
GENERAL ELECTRIC COMPANY,          :
MONSANTO COMPANY, SOLUTIA, INC.,   :
and PHARMACIA CORPORATION,         :
                                   :
                   Defendants.     :
----------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

Two groups of plaintiffs, representing 590 current employees and 486 former employees (collectively, the "Employees") of defendant General Electric Company ("GE"), brought actions against defendants Monsanto Company, Solutia,

Inc., and Pharmacia Corporation (collectively, "Monsanto") claiming negligence, breach of warranty, strict liability, fraud, negligent infliction of emotional distress, intentional infliction of emotional distress, assault, battery, abnormally dangerous activity, medical monitoring, and fear of contracting illness.

A third group of plaintiffs, representing owners and occupiers of land located near a GE facility (the "Landowners"), brought a class action against GE and Monsanto claiming negligence, breach of warranty, strict liability, fraud, negligent infliction of emotional distress, intentional infliction of emotional distress, abnormally dangerous activity, medical monitoring, fear of contracting illness, nuisance, trespass, unjust enrichment, willful and wanton misconduct, and violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. 9601 et seq. ("CERCLA").

The defendants in each action have moved to dismiss certain of the plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)"). By Order dated September 28, 2007, the Court granted in part and denied in part the defendants' motions and indicated that it would subsequently set forth its findings, reasoning, and conclusions in a separate decision. For the

2

reasons stated below, the defendants' motions are GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

The following facts are taken from the Employees' and Landowners' amended complaints,[1] which the Court accepts as true for the purpose of ruling on the motions to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)).

From the 1930s to the mid-1970s, Monsanto sold materials and products containing polychlorinated biphenyls ("PCBs") to GE for use in manufacturing a variety of products including electric motors, generators, gas turbines, wire and cable, insulating materials and microwave tubes at an industrial manufacturing facility, owned and operated by GE, located in Schenectady, New York (the "GE Plant"). Monsanto designed and manufactured PCB-containing products in two plants, located in Alabama and Illinois, and was the sole United States manufacturer of PCBs.

The GE Plant opened in 1886 and today maintains a forty-

---

[1] The amended verified complaints of the current employees (Michael Abbatiello, et al.; No. 06 Civ. 0266; Docket No. 47) and the former employees (Alan Abele, et al.; No. 06 Civ. 3461; Docket No. 30) are substantially identical and are collectively referred to as "Employees' Compl." The amended verified complaint of the landowners (Armand Corlew, et al.; No. 07 Civ. 3258; Docket No. 28) is referred to as "Landowners' Compl."

building operation on approximately 640 acres.  The central and eastern portions of the GE Plant are primarily used for manufacturing electrical products.  The western portion of the GE Plant, which contains three former landfills, two wetlands, and two streams, was used as a dumping ground for solid and water waste from the mid-1940s through the early 1980s.

The Employees and the Landowners allege that Monsanto and GE were aware, beginning in the 1930s, that PCBs were hazardous materials.  By 1975, the National Institute for Occupational Safety and Health and the Environmental Protection Agency reported to Monsanto the health dangers of PCBs.  In the late 1970s, because of the hazardous effect of PCBs on humans and the environment, the United States government officially banned PCB production.  See 15 U.S.C. § 2605(e)(3)(A).

In 1987, the New York State Department of Environmental Conservation ("NYSDEC") classified the GE Plant as a "Class 2 site," meaning that it posed a significant threat to the public health or the environment and action to correct that hazard was required.  In 1995, GE entered into an order on consent (the "Consent Order") to complete a site-wide environmental investigation of the GE Plant.  In accordance with the Consent Order, GE completed a Remedial Investigation ("RI") and Feasibility Study of the GE Plant.  Testing

occurred from 1995 through 2003, and PCB concentrations exceeding the NYSDEC recommended safe screening levels were found in surface soil, subsoil, shallow groundwater, seeps, wetland sediment, and biota (living animal) samples around the GE Plant.

## II. **DISCUSSION**

### A.  STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court construes the complaint broadly, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (quotation marks and citation omitted). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

### B.  STATUTE OF LIMITATIONS

GE moves to dismiss the Landowners' negligence, strict liability, negligent infliction of emotional distress, intentional infliction of emotional distress, abnormally

5

dangerous activity, nuisance, and trespass claims on the ground that they are barred by the statute of limitations.

The limitations period for "actions to recover damages for personal injury or property damage caused by the latent effects of exposure to a substance or combination of substances" is governed by section 214-c(2)of the New York Civil Practice Law and Rules ("§ 214-c(2)").  See Jensen v. Gen. Elec. Co., 623 N.E.2d 547, 555 (N.Y. 1993).  Section 214-c(2) provides for a three-year limitations period, which is "computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier."  N.Y. C.P.L.R. § 214-c(2); see also MRI Broadway Rental, Inc. v. U.S. Mineral Prods. Co., 704 N.E.2d 550, 554 (N.Y. 1998) ("[D]iscovery occurs when, based upon an objective level of awareness of the dangers and consequences of the particular substance, the injured party discovers the primary condition on which the claim is based.") (citation and quotation marks omitted).

The statute of limitations is an affirmative defense, and therefore "the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."  Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995) (citation omitted); see

also <u>Harris v. City of New York</u>, 186 F.3d 243, 250 (2d Cir. 1999) ("[D]ismissal is appropriate only if a complaint clearly shows the claim is out of time.").

GE has not met its burden here.  GE asserts, in a conclusory manner, that the Landowners should have discovered their injuries, at the latest, in 2003 when the RI for the GE Plant was complete.  According to the Landowners, the purpose of the RI was to "collect and evaluate data regarding the nature and extent of contamination" at the GE Plant, not the surrounding properties.  (Landowners' Compl. ¶ 38.) Additionally, the Landowners assert that GE concealed from them and the public that the contamination had spread to surrounding areas.  (<u>See</u> <u>id.</u> ¶ 41.)  In their opposition papers, the Landowners allege that they did not discover, nor should they have discovered through the exercise of reasonable diligence, the injuries to their person or property until on or about April 20, 2006 when soil samples collected from their property were tested and on or about March 14, 2007 when individual plaintiffs' blood samples were tested.  Therefore, GE has not demonstrated that the Landowners knew or should have known, through the exercise of reasonable diligence, of their injuries before their land was tested in April, 2006.

"'Where it does not conclusively appear that a plaintiff had knowledge of facts from which the injury could reasonably

7

be inferred, the complaint should not be dismissed on motion and the question should be left to the trier of fact.'" <u>Bano v. Union Carbide Corp.</u>, 361 F.3d 696, 710 (2d Cir. 2004) (quoting <u>Glod v. Morrill Press Div. of Engraph, Inc.</u>, 564 N.Y.S.2d 905, 908 (App. Div. 4th Dep't 1990)). Accordingly, GE's motion to dismiss on the basis of the statute of limitations is denied.

C.    <u>ASSAULT AND BATTERY</u>

        The Employees allege that Monsanto committed assault and battery by releasing and dispersing toxic substances and pollutants into the Employees' work environment and allowing those substances to remain there. Monsanto moves to dismiss for failure to state a claim. Because the Employees do not oppose the motion, the Court deems this claim abandoned, and Monsanto's motion to dismiss the Employees' assault and battery claims is granted on that basis. <u>See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.</u>, No. 06 Civ. 643, 2007 WL 2694469, at *6 (S.D.N.Y. Sept. 13, 2007); <u>Shady Records, Inc. v. Source Enters.</u>, 371 F. Supp. 2d 394, 396 (S.D.N.Y. 2005); <u>Anti-Monopoly, Inc. v. Hasbro, Inc.</u>, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997).

D.    <u>BREACH OF WARRANTY</u>

        The Employees and Landowners allege that Monsanto breached an implied and express warranty that its PCB-

8

containing products were fit for their intended use and of merchantable quality because they contained harmful, toxic, poisonous and carcinogenic levels of PCBs. The Landowners make the same allegation against GE. Monsanto and GE each moves to dismiss this claim on the ground that it is barred by the statute of limitations, and GE moves to dismiss on the additional ground that it is not a "seller" within the meaning of the New York Uniform Commercial Code (the "N.Y. U.C.C."). The Employees do not oppose Monsanto's motion to dismiss, but the Landowners do oppose Monsanto's and GE's motions to dismiss.

A breach of warranty claim involves the sale of goods and is governed by the N.Y. U.C.C. See Long Island Lighting Co. v. Imo Indus. Inc., 6 F.3d 876, 888 (2d Cir. 1993). "An action for breach of any contract for sale must be commenced within four years after the cause of action accrued." N.Y. U.C.C. § 2-725(1). A cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." N.Y. U.C.C. § 2-725(2). "A breach of warranty occurs when tender of the delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered." Id.

In the instant case, the four-year limitations period has run.  Monsanto stopped selling PCB-containing products to GE when the government banned PCBs in the United States in the late 1970s.  If any warranty was in fact breached, such a breach would have occurred when the PCB-containing products were delivered, i.e., sometime in the 1970s.  Accordingly, Monsanto's and GE's motions to dismiss are granted with respect to the Employees' and Landowners' breach of warranty claims.  Because this claim is barred by the statute of limitations, the Court does not address the merits of the additional defense asserted by GE.

E.    ABNORMALLY DANGEROUS ACTIVITY

One who carries on an ultrahazardous or abnormally dangerous activity is strictly liable for the harm inflicted by the activity.  See Doundoulakis v. Town of Hempstead, 368 N.E.2d 24, 27 (N.Y. 1977).  Imposing strict liability upon entities which undertake ultrahazardous or abnormally dangerous activities is justified by policy considerations determining that "those who engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent."  Id. (citing Restatement (Second) of Torts § 519 (1977)).

"It is for the court to decide whether an activity of a

landowner is abnormally dangerous and warrants imposition of strict liability." Mayore Estates, LLC v. Port Auth. of N.Y. & N.J., No. 02 Civ. 7198, 2003 WL 22232918, at *2 (S.D.N.Y. Sept. 26, 2003). Whether a particular activity qualifies as "abnormally dangerous" depends on a number of factors. Doundoulakis, 368 N.E.2d at 27. In particular, New York courts have looked to the six factors listed in Section 520 of the Restatement (Second) of Torts ("Restatement § 520"): "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520 (1977); see Doundoulakis, 368 N.E.2d at 27; Searle v. Suburban Propane Div. of Quantum Chem. Corp., 700 N.Y.S.2d 588, 591 (App. Div. 3rd Dep't 2000).

   1.   Employees

   The Employees allege that Monsanto engaged in abnormally dangerous activities by "manufacturing, producing, creating, using, releasing and dispersing toxic substances and pollutants into plaintiff's work environment." (Employees'

11

Compl. ¶ 115.)

Monsanto, relying primarily on <u>City of Bloomington v. Westinghouse Elec. Corp.</u>, 891 F.2d 611 (7th Cir. 1989), moves to dismiss this claim on the ground that the manufacture and sale of PCBs are not ultrahazardous activities.  In that case, the City of Bloomington sued Monsanto for damages resulting from the contamination of its sewer system, a sewage treatment plant, and a landfill arising from the use of PCBs in Westinghouse's manufacturing operations.  <u>See</u> <u>id.</u> at 612.  The court held that, under Indiana law, liability for an abnormally dangerous activity should not be imposed for "merely manufacturing dangerous products," but only for the use of such a product.  <u>Id.</u> at 616.  Because the court found that the contamination was caused by Westinghouse's use of Monsanto's dangerous product, it was "unwilling to extend the doctrine of strict liability for an abnormally dangerous activity to the party whose activity did not cause the injury."  <u>Id.</u>  Indeed, courts in the Second Circuit have reached similar conclusions.[2]  <u>See</u>, <u>e.g.</u>, <u>Hamilton v. Accu-tek</u>, 935 F. Supp. 1307, 1324 (E.D.N.Y. 1996) (manufacture of guns

[2] Manufacturing certain products may constitute an abnormally dangerous activity.  The Restatement notes, for example, that the manufacture of explosive materials may be abnormally dangerous under certain circumstances.  <u>See</u> Restatement (Second) of Torts § 520 cmt. h (1977).  There is clearly a difference between manufacturing a dangerous instrumentality, such as a machine gun, where the manufacturing process itself is presumably not abnormally dangerous, and manufacturing a dangerous material, such as plutonium, where both the manufacturing process and the end product may be abnormally dangerous.

not an abnormally dangerous activity).

City of Bloomington is readily distinguishable from the present case, however, for two reasons. First, in that case, the court found that "the harm to the City's sewage and landfill was not caused by any abnormally dangerous activity of Monsanto but by [Westinghouse's] failure to safeguard its waste." 891 F.2d at 615. The court reached that conclusion in large part because the record before it demonstrated that "when alerted to the risks associated with PCBs, Monsanto made every effort to have Westinghouse dispose of the chemicals safely," and that therefore "[t]he risks associated with the disposal of PCBs could have been limited by Westinghouse's exercise of reasonable care." Id. at 614-16.

In contrast, the Employees allege that Monsanto actively concealed the dangers of PCBs from GE. The manufacture and sale of a hazardous material, with no warning as to the dangers associated with it, may constitute an abnormally dangerous activity. Cf. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 175 F. Supp. 2d 593, 629 (S.D.N.Y. 2001) ("MTBE I") (denying motion to dismiss nuisance claim against petroleum companies for contamination of wells, where plaintiffs alleged that defendants had "knowledge of the dangers MTBE poses to groundwater" and "failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners").

13

Second, the Employees based their claim on more than the mere manufacture and sale of PCBs. Their claim includes "releasing and dispersing" the PCBs into their work environment, the GE Plant. Even where the manufacture or sale of a hazardous material does not constitute an abnormally dangerous activity, the manner in which it is transported, stored, used, or disposed of may meet the standard. See, e.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir. 1985) (holding that "allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste constitutes abnormally dangerous activity").

The question for the Court, therefore, is whether the manufacture, sale, and release of PCBs into the Employees' workplace, with no warning as to their toxic properties, was an abnormally dangerous activity. Reviewing the factors enumerated in Restatement § 520, only factors (b) and (d) are clearly present. Accepting the allegations in the Employees' complaint as true compels the Court to conclude that PCBs are highly toxic substances, with the potential to cause "cancer, liver disease, suppression of the immune system, imbalance of hormonal systems, reduction in IQ, thyroid dysfunction, heart dysfunction, hypertension, diabetes, nervous system disorders, sex hormone imbalances, adverse skin conditions and other maladies in humans." (Employees' Compl. ¶ 7.) Additionally, the Employees allege that "Monsanto was the sole United States

14

manufacturer of PCBs." (Id. ¶ 5.) Thus, the manufacture, sale, and delivery of PCBs was "not a matter of common usage." The Court does not have sufficient evidence as to the other factors listed in Restatement § 520, and it is therefore unable, at this stage of the proceedings, to determine whether Monsanto's actions constitute an abnormally dangerous activity. Accordingly, the Court must deny Monsanto's motion to dismiss this claim at this time.

        2.  <u>Landowners</u>

The Landowners allege that Monsanto and GE engaged in abnormally dangerous activities by "manufacturing, producing, creating, using, releasing and dispersing PCBs onto plaintiffs' properties and by allowing those PCBs to remain in the environment to date and continuing." (Landowners' Compl. ¶¶ 100, 186.) Monsanto moves to dismiss on essentially the same grounds described above with respect to the Employees' claim. For the reasons stated above, the Court denies Monsanto's motion.

F.   <u>FRAUD</u>

In order to state a claim for fraud under New York law, a plaintiff is required to allege the following five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." <u>Crigger v.</u>

<u>Fahnestock & Co.</u>, 443 F.3d 230, 234 (2d Cir. 2006); <u>see also</u> <u>Cohen v. Houseconnect Realty Corp.</u>, 734 N.Y.S.2d 205, 206 (App. Div. 2d Dep't 2001).

Rule 9(b) requires that fraud claims be pleaded with particularity. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, conclusory allegations of fraud may be dismissed under Rule 9(b). <u>See</u> <u>Shemtob v. Shearson, Hammill & Co.</u>, 448 F.2d 442, 444 (2d Cir. 1971). For affirmative misrepresentations, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Mills</u>, 12 F.3d at 1175. For claims of fraudulent concealment, the complaint must specify: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." <u>Malmsteen v. Berdon, LLP</u>, 477 F. Supp. 2d 655, 664-65 (S.D.N.Y. 2007) (<u>citing</u> <u>Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.</u>, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)).

Additionally, "a concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose." <u>Remington Rand Corp. v. Amsterdam-Rotterdam</u>

<u>Bank, N.V.</u>, 68 F.3d 1478, 1483 (2d Cir. 1995).  Thus, a party bringing a fraud claim based on concealment must allege the existence of a duty to disclose.  "Such a duty ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust."  <u>Id.</u> Additionally, a party to a business transaction may have a duty to disclose, even in the absence of a fiduciary relationship, if the party (1) "has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth," or (2) "possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."  <u>Brass v. Am. Film Tech., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993) (quotations and citations omitted).

    1.  <u>Employees</u>

The Employees allege that Monsanto knew that exposure to PCBs could cause serious illnesses but concealed that fact in order to maintain sales of PCBs and to avoid liability and other potential adverse consequences of disclosure. Specifically, the Employees allege that Monsanto failed to inform certain corporate customers, including GE, and the public of the dangers of PCBs.  However, the Employees fail to allege that Monsanto had a duty to disclose this information to them.  Nor is the Court aware of any such duty.

17

Additionally, insofar as the Employees' fraud claim is based on affirmative misrepresentations, the complaint does not satisfy the requirements of Rule 9(b) of identifying specific misrepresentations made by Monsanto to the Employees.

To the extent that the Employees base their fraud claim on misrepresentations or omissions made by Monsanto to GE, the claim fails because New York law requires that the plaintiffs themselves be misled by the alleged misrepresentation or omission.[3]  <u>See</u> <u>Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo</u>, 148 F.3d 194, 196 (2d Cir. 1998) ("[A] plaintiff does not establish the reliance element of fraud for purposes of ... New York law by showing only that a third party relied on a defendant's false statements."); <u>Kelly v. L.L. Cool J.</u>, 145 F.R.D. 32, 38 (S.D.N.Y. 1992) ("A plaintiff has failed to state a claim for fraud when he alleges merely that the misrepresentation in question was made to or relied on by a third party.").  Thus, even if Monsanto breached a duty to GE

---

[3] The Employees' complaint alleges: "The general public, General Electric Company and the plaintiffs herein relied on the aforementioned conduct, misrepresentations and concealment of Monsanto to their detriment by continuing to buy and use said products and materials and by improperly disposing of said products and materials after their use thereof." (Employees' Compl. ¶ 92.)  Because GE, not the Employees, is alleged to have conducted the activities described -- buying, using, and disposing of PCB-containing materials -- this allegation must be interpreted as alleging reliance only by GE.  With respect to reliance by the Employees, the allegation is conclusory and unsupported by any factual assertion.  <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1964-65 (A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

by concealing the dangers of PCBs, that concealment would not provide a basis for a fraud claim by the Employees.

Accordingly, the Employees' fraud claim against Monsanto must be dismissed pursuant to Rule 12(b)(6) and Rule 9(b).

2.   <u>Landowners</u>

The Landowners bring claims of fraudulent concealment against both Monsanto and GE, alleging that these parties were aware of the dangers of PCBs and concealed this information from the public.  These claims fail, however, for the same reasons discussed above with respect to the Employees' fraud claim.  First, the Landowners do not allege that either Monsanto or GE had a duty to disclose that would support a fraudulent concealment claim.  Second, the complaint does not meet the pleading requirements of Rule 9(b).  Third, the law requires that the Landowners themselves be misled by the alleged misrepresentation or omission.  Accordingly, the Landowners' fraud claim against Monsanto and GE must be dismissed pursuant to Rule 12(b)(6) and Rule 9(b).

F.   <u>EMOTIONAL DISTRESS</u>

The Landowners allege that Monsanto and GE negligently and intentionally inflicted emotional distress on them by manufacturing, creating, producing, and using PCBs and by failing to advise them of the dangers associated with exposure to PCBs.  Monsanto and GE each moves to dismiss for failure to state a claim.

1.  Negligent Infliction of Emotional Distress

"Negligent infliction of emotional distress has its roots in the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not." Lee v. McCue, 410 F. Supp. 2d 221, 226-27 (S.D.N.Y. 2006).  "The New York State Court of Appeals has permitted plaintiffs to recover in cases of purely emotional injury in extremely limited circumstances ... in which (1) a bystander who was in the zone of danger suffers emotional trauma as a result of their observations or (2) the defendant breaches a direct duty to plaintiff which results in emotional injury to the plaintiff." In re Air Crash Disaster at Cove Neck, Long Island, N.Y. on Jan. 25, 1990, 885 F. Supp. 434, 438 (E.D.N.Y. 1995) (citing Lancellotti v. Howard, 547 N.Y.S.2d 654, 655 (App. Div. 2d Dep't 1989)); see also Lee, 410 F. Supp. 2d at 227.  The zone-of-danger rule "is premised on the traditional negligence concept that by unreasonably endangering the plaintiff's physical safety the defendant has breached a duty owed to him or her for which he or she should recover all damages sustained including those occasioned by witnessing the suffering of an immediate family member who is also injured by the defendant's conduct." Bovsun v. Sanper, 461 N.E.2d 843, 847 (N.Y. 1984).

In the instant case, the Landowners do not allege that they were in the zone of danger or that Monsanto breached a

duty owed to them; therefore, they do not allege any set of facts that "raise a right to relief." Twombly, 127 S.Ct. at 1964-65.  Accordingly, Monsanto's and GE's motions to dismiss are granted with respect to the Landowners' negligent infliction of emotional distress claim.

     2.   Intentional Infliction of Emotional Distress

     To state a claim for intentional infliction of emotional distress, a plaintiff must plead "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. New York Post Co., 612 N.E.2d 699, 702 (N.Y. 1993).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Wiener v. Unumprovident Corp., 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002) (citing Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 90 (N.Y. 1983)).  "Further, 'the emotional distress suffered by the plaintiff must be so severe that no reasonable man could be expected to endure it.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. j (1977)).  Under New York law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to

21

liability for such emotional distress." _Freihofer v. Hearst Corp._, 480 N.E.2d 349, 355 (N.Y. 1985) (_quoting_ Restatement (Second) of Torts § 46 (1977)).

The Landowners allege that Monsanto and GE knowingly subjected them and their properties to exposure to PCBs while concealing the hazards associated with such exposure. Monsanto and GE argue, unpersuasively, that such conduct does not rise to the level of "extreme or outrageous." The Court finds that an allegation of knowingly subjecting individuals to exposure to a highly toxic substance, while purposefully concealing from those so exposed the serious injuries that might result from such exposure, and in reckless disregard of these risks, may constitute "extreme and outrageous" conduct. _See_ _German v. Fed. Home Loan Mortgage Corp._, 885 F. Supp. 537, 571 (S.D.N.Y. 1995) (denying motion to dismiss where landlords knowingly exposed tenants to lead paint, "a highly toxic substance to children," thereby putting them at risk for physical and mental injuries). Accordingly, Monsanto's and GE's motions to dismiss the Landowners' intentional infliction of emotional distress claims are denied.

H.    MEDICAL MONITORING AND FEAR OF CONTRACTING ILLNESS

The Landowners bring claims for medical monitoring and fear of contracting illness. Monsanto and GE each moves to dismiss, arguing that New York does not recognize an independent cause of action for medical monitoring or fear of

contracting illness.

1.   Medical monitoring

"Medical monitoring is one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 849 (3d Cir. 1990) ("Paoli I"). The injuries caused by exposure to toxic substances may take years to manifest themselves physically, and during this latency period, plaintiffs are burdened with the expense of regular medical testing. This medical monitoring is intended to detect the onset of latent injuries or diseases and to facilitate early diagnosis and treatment. However, plaintiffs may be unable to recover under traditional tort law, which generally requires a presently existing physical injury. Recognizing this difficulty, a number of states have allowed plaintiffs to bring claims for the costs of periodic medical monitoring. Of the states that recognize a claim for medical monitoring, some consider it to be an independent cause of action that does not require a separate compensable injury, while others treat it as a form of remedy for an existing tort, such as negligence. Compare Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424, 429 (W.Va. 1999) (independent cause of action), with Hinton ex rel. Hinton v. Monsanto Co., 813 So.2d 827 (Ala. 2001) (remedy available only with present physical injury).

The New York Court of Appeals has not specifically addressed the issue of medical monitoring claims, but several lower courts have held that medical monitoring expenses can constitute a form of damages, even where the present injury is insignificant.

In Askey v. Occidental Chem. Corp., 477 N.Y.S.2d 242 (App. Div. 4th Dep't 1984), the Appellate Division addressed "the novel issue" of "whether those persons who have an increased risk of cancer, genetic damage and other illnesses by reason of their exposure to the toxic chemicals emanating from the landfill, but whose physical injuries are not evident, should be certified as a class for the purpose of determining their right to recover the costs of future medical monitoring services to diagnose warning signs of the development of disease." Id. at 244. The court determined that "there is a basis in law to sustain a claim for medical monitoring as an element of consequential damages." Id. at 256. It held that "a defendant is liable for 'reasonably anticipated' consequential damages which may flow later from that invasion although the invasion itself is 'an injury too slight to be noticed at the time it is inflicted.'" Id. at 247 (quoting Schmidt v. Merchants Despatch Transp. Co., 200 N.E. 824, 827 (1936)).

Since Askey, a number of other New York state courts have recognized claims for medical monitoring. See, e.g., Allen v.

Gen. Elec. Co., 821 N.Y.S.2d 692 (App. Div. 4th Dep't 2006); Abusio v. Consol. Edison Co. of N.Y., 656 N.Y.S.2d 371 (App. Div. 2d Dep't 1997); Gerardi v. Nuclear Util. Servs., Inc., 566 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991). None of these decisions, however, explicitly recognizes medical monitoring as a separate cause of action, independent of any present physical injury.

Federal courts considering the issue have reached differing conclusions. Compare In re World Trade Center Disaster Site Litig., No. 21 MC 100, 2006 WL 3627760, at *3 (S.D.N.Y. Dec. 12, 2006) (Medical monitoring and fear of cancer "may perhaps be considered as equitable remedies, if causes of action are otherwise proved and if the remedies are held to be appropriate and in accordance with the law. They do not constitute independent causes of action."), with Beckley v. United States, No. 92 Civ. 8137, 1995 WL 590658, at *4 (S.D.N.Y. Oct. 5, 1995) ("In New York, courts recognize a separate cause of action, with a relaxed standard of proof, for medical monitoring expenses due to exposure to toxic chemicals when the plaintiff cannot show with reasonable certainty that he will contract a disease as a result of the exposure."), and Gibbs v. E.I. DuPont De Nemours & Co., 876 F. Supp. 475, 479 (W.D.N.Y. 1995) ("Although the New York courts have not conclusively ruled on the availability of a claim for

medical monitoring in the absence of present injury, I believe that <u>Askey</u> accurately represents a growing national acceptance of a such a claim, and would be embraced by the New York Court of Appeals.").

In <u>Beckley</u>, the court offered the following rationale in support of recognizing an independent cause of action for medical monitoring:

> In cases involving a present injury combined with a relatively remote possibility of a future, more serious disease, adherence to a "single cause of action" theory would lead to unjust results in cases where the plaintiff does eventually contract the disease: if the plaintiff sues on his present injury, he will be unable to recover for the future disease due to his low risk of eventually contracting it; yet, if the plaintiff waits to bring suit until he contracts the disease, his suit could be barred by the statute of limitations.  To remedy this injustice, many courts recognize separate causes of action in the case of a present injury combined with a low probability of a future, more serious disease.

1995 WL 590658, at *4.

This reasoning has clear application to the present case. If no separate cause of action for medical monitoring were available, the Landowners, having discovered the PCB contamination, would face a dilemma: either (1) bring a lawsuit, and be denied recovery for the increased risk of contracting serious illnesses; or (2) bear the financial burden of medical monitoring and risk being barred by the statute of limitations from suing later in the unfortunate event that a serious illness were contracted.  The Court is not persuaded that the New York Court of Appeals would endorse

26

such a result.

On this point, it is instructive to examine the treatment by the New York state courts of a closely analogous situation, that where a person contracts a disease as a result of exposure to a toxic substance, and later contracts a second, separate disease. For example, a person exposed to asbestos may contract asbestosis and, years later, may also develop a particularly virulent form of cancer known as mesothelioma. In response, most state courts have developed what the Supreme Court has referred to as the "separate disease rule," according to which "the statute of limitations runs separately for each asbestos-related disease." Norfolk & W. Ry. Co. v. Ayers, 538 U.S. 135, 152 (2003). The Supreme Court explained:

> The rule evolved as a response to the special problem posed by latent-disease cases. Under the single-action rule, a plaintiff who recovered for asbestosis would then be precluded from bringing suit for later developed mesothelioma. Allowing separate complaints for each disease, courts determined, properly balanced a defendant's interest in repose and a plaintiff's interest in recovering adequate compensation for negligently inflicted injuries.

Id. at 153 n.12.

New York courts have recognized such a rule. "Where the statute of limitations has run on one exposure-related medical problem, a later exposure-related medical problem that is 'separate and distinct' is still actionable under New York's two-injury rule." Braune v. Abbott Labs., 895 F. Supp. 530, 555 (E.D.N.Y. 1995) (citing Fusaro v. Porter-Hayden Co., 548

N.Y.S.2d 856, 858-59 (N.Y. Sup. Ct. 1989), aff'd, 565 N.Y.S.2d 357 (App. Div. 1st Dep't 1991)).  "Under the rule, diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the presence of one is not necessarily a predicate for the other's development."  Id. at 555-56.

The Court finds no basis for concluding that the New York Court of Appeals would not embrace a similar rule in cases where the present damage is not a physical injury but the financial burden associated with periodic medical monitoring. Accordingly, the Court agrees with the decisions of the courts in Beckley and Gibbs and concludes that, in cases involving exposure to toxic materials, the New York Court of Appeals would recognize an independent cause of action for medical monitoring.

In Gibbs, the court adopted the elements of the medical monitoring claim as set forth by the Third Circuit in Paoli I. Subsequently, the Supreme Court of Pennsylvania adopted the Paoli I elements with some modification.  Redland Soccer Club, Inc. v. Dep't of the Army, 696 A.2d 137, 145-46 (Pa. 1997). The Redland court held that to prevail on a common law claim for medical monitoring, a plaintiff must prove: "(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a

significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles." Id. These elements incorporate the Appellate Division's holding in Askey, where the court stated:

> The future expense of medical monitoring, could be a recoverable consequential damage provided that plaintiffs can establish with a reasonable degree of medical certainty that such expenditures are "reasonably anticipated" to be incurred by reason of their exposure.

Askey 477 N.Y.S.2d at 247 (quoted in Paoli I, 916 F.2d at 851).

The third element set forth above specifically references negligence, presumably because Paoli I involved an allegation of negligent conduct. There is no reason why a cause of action for medical monitoring could not be grounded on other types of tortious conduct, such as acts that are intentional or those for which a defendant is held strictly liable. In the present case, a cause of action for medical monitoring may be based on negligence, strict liability, abnormally dangerous activities, nuisance, or trespass. Accordingly, the third element must be modified to reflect this broader scope.

The Court therefore predicts that the New York Court of

Appeals would recognize a cause of action for medical monitoring, established by proving: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's tortious conduct; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

In this case, the Landowners allege that they were exposed to PCBs because of Monsanto's and GE's tortious conduct, resulting in elevated levels of PCBs in their blood and body organs, which puts them at an increased risk of developing PCB-related cancers and diseases and makes regular medical monitoring necessary. Drawing all reasonable inferences in favor of the plaintiffs, the Court finds that the Landowners have adequately alleged the elements set forth above. Accordingly, Monsanto's and GE's motions to dismiss are denied with respect to the Landowners' medical monitoring claim.

> 2.   Fear of Contracting Illness

The analysis above also applies to claims for fear of

contracting illness following exposure to a toxic substance. Like the financial burden of medical monitoring, fear of contracting illness is a present damage. As it does not depend on whether an illness is actually contracted, it is not speculative. Rather, it compensates a victim for the presently-existing emotional distress that accompanies the knowledge of an increased risk of contracting a serious illness. The Court therefore predicts that, in cases of exposure to toxic substances, the New York Court of Appeals would recognize a separate cause of action for fear of contracting illness.

In order to guarantee the trustworthiness of such a claim, a plaintiff is required to establish "both that he was in fact expose to the disease-causing agent and that there is a 'rational' basis for his fear of contracting the disease." Wolff v. A-One Oil, Inc., 627 N.Y.S.2d 788, 789 (App. Div. 2d Dep't 1995); see also Dangler v. Town of Whitestown, 672 N.Y.S.2d 188, 190 (App. Div. 4th Dep't 1998). "This 'rational basis' has been construed to mean the clinically demonstrable presence of PCBs in the plaintiff's body, or some indication of PCB-induced disease i.e., some physical manifestation of PCB contamination." Abusio, 656 N.Y.S.2d at 372. In Patton v. General Signal Corp., 984 F. Supp. 666 (W.D.N.Y. 1997), the court explained why the burden of proof is higher for a fear of contracting illness claim than for a medical monitoring

claim:

> Exposure to a toxic substance might in some instances be
> enough to make medical monitoring advisable, but not
> enough to provide a rational basis for a fear that is
> severe enough to cause the plaintiff compensable
> emotional distress.  Moreover, there could be cases in
> which the plaintiff cannot prove that a certain substance
> is present in his body, but could nevertheless present
> expert medical testimony that the plaintiff's exposure to
> that substance warrants future medical monitoring.

Id. at 674.

In this case, the Landowners have alleged that they have
elevated levels of PCBs in their bodies, and that they have
reasonably developed the fear of sustaining serious illnesses
due to the latent effects of their exposure to PCBs.  These
factual allegations are sufficient to support a claim for fear
of contracting illness.  Accordingly, Monsanto's and GE's
motions to dismiss are denied with respect to this claim.

I.  NUISANCE

The Landowners contend that Monsanto's and GE's conduct
was sufficient to create a private nuisance.  Monsanto and GE
each moves to dismiss for failure to state a claim.

"A private nuisance threatens one person or a relatively
few, an essential feature being an interference with the use
or enjoyment of land."  Copart Indus., Inc. v. Consol. Edison
Co. of N.Y., 362 N.E.2d 968, 971 (N.Y. 1977) (citations
omitted).  To state a claim for private nuisance, a plaintiff
must show that the conduct at issue "is a legal cause of the
invasion of the interest in the private use and enjoyment of

land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." Id.; see also Scribner v. Summers, 84 F.3d 554, 559 (2d Cir. 1996).

The Landowners allege that Monsanto and GE caused PCBs to enter onto their land, thereby interfering with their use and enjoyment of it. Because the Court did not dismiss the Landowners' claims of negligence and abnormally dangerous activity, the second element of the nuisance claim is adequately pleaded. The question for the Court, then, is whether the Landowners allege facts sufficient to support their claim that the conduct of Monsanto and GE is a legal cause of the invasion of their land. As the Supreme Court recently clarified, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1965 (citations omitted).

With respect to GE, the Landowners allege that "GE for many years released, and continues to release, PCBs in the air, soil, surface water and/or groundwater in, on and/or adjacent to the plaintiffs' properties" (Landowners' Compl. ¶ 10), and that this conduct "resulted in an intrusion and the continued intrusion upon plaintiffs' properties" (id. ¶ 199).

33

These allegations are sufficient to support the claim that GE's conduct proximately caused the intrusion.

As for Monsanto, the Landowners allege that Monsanto manufactured and sold PCB-containing materials and products to GE, and that Monsanto concealed the dangers of PCB from GE. Under New York law, "'[e]veryone who creates a nuisance or participates in the creation or maintenance thereof is liable for it.'" Penn Cent. Transp. Co. v. Singer Warehouse & Trucking Corp., 447 N.Y.S.2d 265, 267 (App. Div. 1st Dep't 1982) (quoting Hine v. Aird-Don Co., 250 N.Y.S. 75, 77 (App. Div. 3rd Dep't 1931)); see also Restatement (Second) of Torts § 834 ("One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on.").

In MTBE I, a court in this District ruled that a nuisance claim may be maintained against the manufacturer or distributor of gasoline containing MTBE where the complaint contains allegations "sufficient to demonstrate defendants' participation and assistance in the creation of a nuisance." 175 F. Supp. 2d at 629. Specifically, the court in MTBE I denied a motion to dismiss a nuisance claim against several petroleum companies for contamination of wells, based on allegations that the defendants had "knowledge of the dangers MTBE poses to groundwater" and "failed to warn the downstream

34

handlers, retailers, gasoline purchasers, government officials
and well owners." <u>Id.</u>

Similarly, in this case, the Landowners allege that
"[w]ith full knowledge of the hazards of PCBs, Monsanto made
the conscious decision to suppress and conceal these facts
from GE, the public and plaintiffs." (Landowners' Compl. ¶
77.) The Court finds that the factual allegations in the
Landowners' complaint are sufficient to support the claim that
Monsanto participated to a substantial extent in creating the
nuisance, and that they are "enough to raise a right to relief
above the speculative level." <u>Twombly</u>, 127 S. Ct. at 1965.

Accordingly, Monsanto's and GE's motions to dismiss the
Landlord's nuisance claim are denied.

J.   <u>TRESPASS</u>

<u>      </u>"Under New York law, trespass is the intentional invasion
of another's property." <u>Scribner</u>, 84 F.3d at 557 (citations
omitted). To be liable, the trespasser "need not intend or
expect the damaging consequence of his intrusion, he must
intend the act which amounts to or produces the unlawful
invasion, and the intrusion must at least be the immediate or
inevitable consequence of what he willfully does, or which he
does so negligently as to amount to willfulness." <u>Phillips v.
Sun Oil Co.</u>, 121 N.E.2d 249, 250-51 (N.Y. 1954). "To
constitute such a trespass, the act done must be such as will
to a substantial certainty result in the entry of the foreign

matter." Id. (citation omitted).

    1.  GE

      The Landowners allege that "GE knew that its PCB-containing products were dangerous and that PCBs were intentionally discharged, released, emitted and migrated onto [the Landowners'] properties," and that the Landowners' properties "continue to be exposed to and contaminated by PCB-containing products designed, manufactured, sold, distributed and disposed by GE." (Landowners' Compl. ¶¶ 207, 210.)

    GE contends that the Landowners have not alleged that GE intended that the PCBs end up on their properties or that the presence of PCBs on their properties was the inevitable consequence of GE's alleged discharge. However, the question is not whether GE intended the consequences of its act -- the invasion of PCBs onto the Landowners' properties -- but whether GE "intend[ed] the act which amounts to or produces the unlawful invasion." Phillips, 121 N.E.2d at 250-51; see also Scribner, 84 F.3d at 557. GE does not dispute that it used or disposed of PCB-containing products nor does it dispute that it did so intentionally.

    The New York Court of Appeals has held that, when "polluting material has been deliberately put onto, or into, defendant's land," the defendant is liable for damage to his neighbor's land if the defendant "had good reason to know or expect that subterranean and other conditions were such that

there would be passage from defendant's to plaintiff's land."
<u>Phillips</u>, 121 N.E.2d at 251.  The Landowners allege that GE
knew, or should have known, that the PCBs would migrate onto
their properties.  This allegation is sufficient to survive a
motion to dismiss.

Accordingly, GE's motion to dismiss the trespass claim is
denied.

2.    <u>Monsanto</u>

The Landowners allege that "Monsanto knew that its PCB-
containing products were dangerous and that PCBs were
intentionally discharged, released, emitted and migrated onto
[the Landowners'] properties" and that the Landowners'
properties "continue to be exposed to and contaminated by PCBs
designed, manufactured, sold and distributed by Monsanto."
(Landowners' Compl. ¶¶ 121, 124.)  However, the presence of
PCBs on the Landowners' properties can not be said to be the
"immediate or inevitable consequence" of Monsanto's
manufacture, sale, and delivery of PCB-containing products to
GE.  Accordingly, Monsanto's motion to dismiss the claim for
trespass is granted.

K.    <u>UNJUST ENRICHMENT</u>

The Landowners bring a claim of unjust enrichment against
Monsanto and GE on the ground that they "have/or will incur
the costs of determining the nature and extent of
contamination on their properties and the cost of restoring

their properties to their pre-contaminated condition" and
Monsanto and GE have been enriched "in that it has the use of
funds that it otherwise should have expended" to reimburse the
Landowners for these costs. (Landowners' Compl. ¶¶ 130, 133,
216, 219.)  Monsanto and GE each moves to dismiss on the
ground that the Landowners fail to state a claim.

Under New York law, "[u]njust enrichment is a
quasi-contractual remedy" used "as an alternative to contract,
where a contractual relationship has legally failed." Reading
Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301,
333-34 (S.D.N.Y. 2003) (citing Lightfoot v. Union Carbide
Corp., 110 F.3d 898, 905 (2d Cir. 1997); Gidatex, S.r.L. v.
Campaniello Imps., Ltd., 49 F. Supp. 2d 298, 301 (S.D.N.Y.
1999)).

The Landowners' claim fails here because they have not
alleged that they had any contractual or quasi-contractual
relationship with Monsanto or GE. See Czech Beer Imps., Inc.
v. C. Haven Imps., LLC, No. 04 Civ 2270, 2005 WL 1490097, at
*7 (S.D.N.Y. June 23, 2005) ("'The requirements [of unjust
enrichment] clearly contemplate that the defendant and the
plaintiff must have had some type of direct dealing, an actual
relationship or some greater substantive connection.'")
(quoting Redtail Leasing, Inc. v. Bellezza, No. 95 Civ. 5191,
1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997)).
Accordingly, Monsanto's and GE's motions to dismiss are

granted with respect to the Landowners' unjust enrichment claim.

L.    WILLFUL AND WANTON MISCONDUCT

    The Landowners allege willful and wanton misconduct to support a claim for punitive damages against Monsanto and GE. Monsanto and GE move to dismiss on the ground that a claim for punitive damages is not a separate cause of action.  The Landowners agree that punitive damages is not a separate cause of action for pleading purposes.  See Rocanova v. Equitable Life Assurance Soc'y of the U.S., 634 N.E.2d 940, 945 (N.Y. 1994) ("A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action.")

    "Under New York law, punitive damages are appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct."  Action S.A. v. Marc Rich & Co., 951 F.2d 504, 509 (2d Cir. 1991) (citations and quotation marks omitted).  Insofar as the Landowners allege willful and wanton misconduct to support an award of punitive damages as a separate cause of action, Monsanto's and GE's motions to dismiss are granted.  However, the Landowners' allegations of willful and wanton misconduct can be asserted as part of an "underlying cause of action upon which a demand for punitive damages can be grounded."  Rocanova, 634 N.E.2d at 945.

### III. ORDER

39

For the reasons stated above, it is hereby

ORDERED that the Order of the Court in this action dated September 28, 2007 is amended to incorporate the discussion set forth in the decision above; and it is further

ORDERED that the motion to dismiss (06 Civ. 0266, Docket No. 9) of defendants Monsanto Company, Solutia, Inc., and Pharmacia Corporation (collectively, "Monsanto") is GRANTED in part and DENIED in part.  The motion is GRANTED with respect to the causes of action for breach of warranty, fraud, assault, and battery; and it is DENIED with respect to the cause of action for abnormally dangerous activity; and it is further

ORDERED that the motion to dismiss (06 Civ. 3461, Docket No. 6) of Monsanto is GRANTED in part and DENIED in part.  The motion is GRANTED with respect to the causes of action for breach of warranty, fraud, assault, and battery; and it is DENIED with respect to the cause of action for abnormally dangerous activity; and it is further

ORDERED that the motion to dismiss (07 Civ. 3258, Docket No. 11) of Monsanto is GRANTED in part and DENIED in part. The motion is GRANTED with respect to the causes of action for breach of warranty, fraud, negligent infliction of emotional distress, trespass, unjust enrichment, and willful and wanton misconduct; and it is DENIED with respect to the causes of

action for intentional infliction of emotional distress, abnormally dangerous activity, nuisance, medical monitoring, and fear of contracting illness; and it is further

**ORDERED** that the motion to dismiss (07 Civ. 3258, Docket No. 8) of defendant General Electric Company is GRANTED in part and DENIED in part. The motion is GRANTED with respect to the causes of action for breach of warranty, fraud, negligent infliction of emotional distress, unjust enrichment, and willful and wanton misconduct; and it is DENIED with respect to the causes of action for negligence, strict liability, intentional infliction of emotional distress, abnormally dangerous activity, nuisance, medical monitoring, fear of contracting illness, and trespass.

**SO ORDERED.**

Dated:    New York, New York
          2 November 2007

                                   Victor Marrero
                                   U.S.D.J.

41